Please type or print the following information:

NAME: _____
ADDRESS: _____
CITY: _____
STATE: _____

Signature

Kathie BOUDIN, Petitioner,

v.

Dale THOMAS, Warden of MCC, Norman Carlson, Director of Federal Bureau of Prisons, Federal Bureau of Prisons, and John Martin, United States Attorney, Respondents.

No. 81 Civ. 7190 (KTD).

United States District Court,
S. D. New York.

Jan. 7, 1982.

OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

Liberty for all Americans, no matter to what philosophy they may adhere, is based upon reasonable restraints on individual action imposed for the common good. These restraints are embraced by Americans as a guarantee of their freedom and are found in our laws, rules and regulations. They are to be enforced in a totally nondiscriminatory manner. Adherence to these principles both by individuals and by government officials cannot be avoided because of mass hysteria over the alleged revolutionary ideas of an individual nor from the craven fear of criticism from the mass media. It is embarrassing for this court to have to remind the United States Department of Justice and its representatives of these fundamental principles; yet it appears necessary to do so in this matter.

Petitioner Kathie Boudin, a state court pre-trial detainee presently incarcerated at the Metropolitan Correctional Center ["MCC"], brought on by Order to Show Cause a petition for a writ of habeas corpus challenging the conditions of her confinement.[1] It is undeniable that these conditions of confinement are unique. It is my conclusion that they are also discriminating and in violation of the pertinent rules and regulations of the Bureau of Prisons. The celebrity surrounding petitioner and her alleged crime must be explained in order to understand the nature of the MCC's treatment of Ms. Boudin.

## BACKGROUND

On or about October 20, 1981, Kathie Boudin was arrested in connection with the armed robbery of a Brinks armored truck in which one Brinks guard and two Nyack, New York police offers were killed. Ms.

Frankfurt, Garbus, Klein & Selz, P. C., New York City, for petitioner Kathie Boudin; Martin Garbus, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for respondents; Carolyn Simpson, Asst. U. S. Atty., New York City, of counsel.

1. Ms. Clark originally joined in this action but withdrew her habeas corpus petition. This withdrawal was permitted without prejudice with the proviso that any relief accorded to Ms. Boudin would similarly be accorded Ms. Clark.

This memorandum and order only addresses one of the three order to show causes presented by petitioners. One, seeking immediate eye treatment, was denied as moot after the problem had been resolved and the other, requesting permission for Ms. Boudin's childhood pediatrician to visit her, was denied.

Boudin was arrested leaving the cab of a U-Haul van involved in the shootout. There are no allegations that Ms. Boudin was armed at any time during the crimes alleged.

Subsequent to her arrest, petitioner was taken to the Rockland County Jail. Rockland County District Attorney Kenneth Gribetz was concerned about the lack of adequate security measures available at the jail and agreed with United States Attorney for the Southern District of New York, John Martin, to transfer Ms. Boudin and a co-defendant Judith Clark to the custody of the Federal Bureau of Prisons for safekeeping. (See Exhibit 1, Affidavit of Warden Thomas, November 23, 1981). Petitioner arrived at the MCC on October 26, 1981 "amidst unparalleled security." (Affidavit of Warden Thomas, November 23, 1981, ¶ 5). Upon her arrival, Ms. Boudin was immediately placed in administrative detention "because [she was] deemed to pose a high risk to the security of the institution and those within it." (Id., at ¶ 13). Petitioner has remained in this secluded detention since that time. The conditions of her confinement are as follows:

1. Visits with members of her immediate family are permitted two days a week for a two hour time period;

2. No contact visits are allowed, even with Ms. Boudin's infant child;

3. Attorney visits are permitted any time between 8:00 a. m. and 8:30 p. m. Joint counsel visits are also permitted.[2]

4. Petitioner is confined to her cell, except for the visits described above, for the rest of the day. One hour of recreation per day, consisting of solitary admission to the hall adjoining her cell, is provided;

5. Petitioner has been separated from her co-defendant Ms. Clark since her arrival at the MCC; and

6. Meals are served in her cell.

Petitioner asserts that the continuation of administrative detention and denial of contact visits is in violation of her constitutional and statutory rights. She requests immediate relief from the restrictive conditions of her confinement.

## DISCUSSION

 The challenging of prison conditions imposed after studied consideration by the respondents causes this court great concern. I must heed the recent admonitions of the Supreme Court:

Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

. . . . .

But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.

*Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). The Supreme Court decision in *Wolfish* does not mandate that I automatically defer all challenges of prison policy to the institution's administration, but it does mean that the infringement upon constitutional rights must be severe before the judiciary is authorized to intervene. The test enunciated in *Wolfish* is twofold: first, the court must determine if the condition is specifically imposed for the purposes of punishment or for a legitimate governmental purpose, *Wolfish, supra*, at 538, 99 S.Ct. at 1873; secondly, if evidence of punishment is lacking, this court must determine if the restriction is "reasonably related" to a legitimate objective or constitutes an exaggerated response. *Id.* If a reasonable relationship can be established, punishment is not

2. On November 6, 1981, at the government's request, Judge Knapp issued an order prohibiting joint legal visits. Warden Thomas has since allowed such visits.

present and the Due Process clause is not violated.[3]

█ The question before me is not whether the MCC has chosen the best possible methods for diminishing risks attendant to the incarceration of Ms. Boudin, but rather, whether the means utilized amount to punishment. *See Wolfish, supra,* at 554, 99 S.Ct. at 1882; *Valentine v. Englehardt,* 474 F.Supp. 294, 301 (D.N.J.1979). This question is answered by balancing the security risk posed by the petitioners against their constitutional rights. I cannot simply defer to the Warden and abandon my duty to uphold the constitution. "There is no iron curtain drawn between the Constitution and the prisoners of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Wolfish, supra,* 441 U.S. at 520, 99 S.Ct. at 1861; *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir.), *cert. denied,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 970 (1981). For the reasons stated herein, I am constrained to order the immediate suspension of administrative detention and the initiation of contact visits between petitioner and all approved visitors.

## I. *Administrative Detention*

█ Although the facts presented by both sides differ on the exact hours per day Ms. Boudin is locked up in her cell, it is not disputed that her detention effectively segregates her from Ms. Clark and the general prison population. Such restrictive incarceration is permissably imposed only under certain circumstances. The relevant federal regulations binding the Bureau of Prisons are as follows:

§ 541.20 Administrative detention.

Administrative detention is the status of confinement of an inmate in a special housing unit in a cell either by himself or with other inmates which serves to remove the inmate from the general population.

. . . . .

The Warden may place an inmate in administrative detention when the inmate is in holdover status (i.e., en route to a designated institution) during transfer, or is a new commitment pending classification. The Warden may also place an inmate in *administrative detention when his continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution* and when the inmate:

(1) Is pending a hearing for a violation of institution regulations;

(2) Is pending investigation of a violation of institution regulations;

(3) Is pending investigation, or trial for a criminal act;

. . . . .

(b) Memorandum Detailing Reasons for Placement. The Warden shall prepare a memorandum detailing the reasons for placing an inmate in administrative detention, with a copy given to the inmate, provided institutional security is not compromised thereby. Staff shall deliver this memorandum to the inmate within 24 hours of his placement in administrative detention, unless this delivery is precluded by exceptional circumstances.

(c) Review of Inmates Housed in Administrative Detention. . . . The reviewing authority shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the reviewing authority at the hearing unless the inmate waives the right to appear. Staff shall conduct a psychiatric or psychological assessment, including a personal interview, when administrative detention con-

---

**3.** Petitioners also allege violations of the First and Ninth Amendments. These will be dealt with *infra.*

tinues beyond 30 days. The assessment, submitted to the reviewing authority in a written report, should address the inmate's adjustment to his surroundings and the threat the inmate poses to self, staff and other inmates. Staff shall conduct a similar psychiatric or psychological assessment and report at subsequent one-month intervals should detention continue for this extended period. *Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see § 541.21). An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the reviewing authority.* Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of staff's decision and the basis for this finding. The reviewing authority shall release an inmate from administrative detention which reasons for placement cease to exist.

(d) Conditions of Administrative Detention. The basic level of conditions as described in § 541.19 for disciplinary segregation also apply to administrative detention. *If consistent with available resources and the security needs of the unit, the Warden shall give an inmate housed in administrative detention the same general privileges given to inmates in the general population.* Unless there are compelling reasons to the contrary, institutions shall provide commissary privileges and reasonable amounts of personal property. Exercise periods, at a minimum, will meet the level established for disciplinary segregation and will exceed this level where resources are available. The Warden shall give an inmate in administrative detention visiting and correspondence privileges in accordance with Part 540 of this chapter. (emphasis added).

Mr. Dale Thomas, the Warden of the MCC, decided on the basis of news coverage and vague unconfirmed law enforcement reports that Ms. Boudin posed a security threat to the institution and placed her in indefinite administrative detention and "what amounts to solitary confinement." *Brown v. Neagle*, 486 F.Supp. 364, 366 (S.D. W.Va.1979). The *Brown* case is analogous to the instant case in many respects. Ms. Brown was convicted of bank robbery, a crime she committed while a member of the George Jackson Brigade, a leftist and allegedly terrorist organization. After her conviction, she was placed in administrative detention to prevent any possible escape. Apparently Ms. Brown and Joanne Chesimard, an escapee from prison on November 2, 1979, were friends in prison and received a number of mutual visitors. The District Court, however, prohibited further administrative detention until prison officials set forth "credible evidence upon which to base a reasonable belief that the petitioner or, in this instance, someone else intends to effect her escape." *Brown, supra*, at 368.

Similarly, Ms. Boudin is subjected to the effects of isolation based upon conclusory evidence linking petitioner to the Joanne Chesimard escape and terrorist organizations. Neither the sealed[4] or public affidavits presented in this case substantiate allegations of petitioner's connection to Ms. Chesimard or the Black Liberation Army. They clearly do not amount to any documentation as required by Section 541.20(c) of the Bureau of Prisons own rules.

█ Since petitioner has been in custody, she has not committed any act or engaged in any conduct to suggest a "serious threat to life, property, self, staff, other inmates or to the security of the institution." 28 C.F.R. § 541.20(a) (1980). While I am not second-guessing the Warden's determination that petitioner may indeed present risks of escape and potential violence, I believe that the institution's response to this risk is exaggerated and consequently amounts to punishment in violation of

4. The sealed material is almost totally conclusory in nature and presents no real evidence of any substance. I find it unpersuasive.

*Wolfish.* This conclusion is supported by the affidavits of Dan Pochoda, Kenneth F. Schoen and Louis Greco, experts in the field of correctional security, who toured the MCC, and were apprised of the charges against Ms. Boudin and the escape history of the MCC. All three experts agreed "that the present conditions of confinement of Kathie Boudin are an over-reaction by the prison authorities to the security threat she poses." (Affidavit of Kenneth Schoen, ¶ 14).

The punitive nature of Ms. Boudin's confinement is further reinforced by her singular treatment. The government asserts that Ms. Boudin's "unique" (Transcript, pp. 115, 179) case merits a unique remedy, however, no facts support this conclusion. The MCC has housed other inmates charged with violent crimes and allegedly linked with terrorist organizations without resorting to the oppressive conditions imposed on Ms. Boudin. Neither Leroy ("Nicky") Barnes, a convicted large scale narcotics dealer, nor Maria Torres, an alleged FALN conspirator charged with manufacturing explosives relating to a fatal bombing, nor Richard D. Moore, a New York State prisoner convicted of attempted murder, to cite three specific examples, were ever indefinitely housed in administrative detention. (*See* Letter of AUSA Simpson, dated December 23, 1981). Detention was only utilized for these high risk inmates to punish infractions of prison rules and even then the detention was of a short duration. Ms. Boudin, on the other hand, has broken no rules, threatened no escapes nor presented any substantiated risk to either the staff or other inmates. In fact, the disciplinary segregation imposed on disruptive inmates allows greater freedom than administrative detention. (Transcript, p. 62).

Administrative detention is intended as short-term housing, but the MCC has relegated Ms. Boudin to an indeterminate commitment there without adequate reasons. The nature of her crime, her alleged but unsubstantiated affiliation with a terrorist organization is not sufficient cause to single out Ms. Boudin for the type of treatment she has received. Respondents are unable to present any other evidence necessitating the imposed conditions. The security risk posed by petitioner does not appear substantially greater than the risk posed by many other inmates housed at the MCC. Nevertheless, the extent of the reaction of the federal prison system to this perceived risk is unwarranted in the circumstances presented by this case.

Ms. Boudin, as a pre-trial detainee, is not to be punished. *Wolfish* 441 U.S. at 535, 99 S.Ct. at 1871. To date, she has never been convicted of any crimes. The actions of respondents, however, suggest that Ms. Boudin is being punished. Even petitioner's simple request for proper eyeglasses required court intervention before her request was granted. Prison authorities are not afforded unbridled discretion to bend the regulations for a newsworthy inmate. This court's intervention is mandated to insure that Ms. Boudin is treated in accordance with the prison regulations.

The administrative detention as it stands today subjects Ms. Boudin not only to obvious hardships, such as restricted confinement in her cell for the majority of the day, inability to go to the law library, or participate in the available educational programs or utilize the recreation area but also to potential psychological damage. *Wolfish v. Levi,* 573 F.2d 118, 128–29 (2d Cir. 1978), *rev'd, Wolfish, supra; Brown, supra,* at 367. Dr. Frank Rundle, a psychiatrist with expertise in prison psychiatry, attests to the fact that "The conditions of Ms. Boudin's confinement which nearly totally prohibit meaningful human interaction and relationships is psychologically distructive [sic] to her . . . . Based on my experience at Soledad Prison and in inspection of numerous other prisons, I conclude that there is irremedial psychological harm after thirty days of conditions of confinement such as are imposed on Ms. Boudin." (Affidavit of Dr. Rundle, ¶¶ 8, 17)

The severity of this confinement has not been shown to be at all related to any institutional security need. Petitioner has

met her "heavy burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and policies." *Wolfish, supra,* 441 U.S. at 562, 99 S.Ct. at 1886. It seems certain that the MCC can afford Ms. Boudin many of the privileges she is now denied in administrative detention without sacrificing security. Respondents may have legitimate reasons for maintaining the separation of Ms. Boudin and Ms. Clark and taking other measures to secure the facility, but total separation from all prisoners and denial of all privileges accorded the general prison population cannot stand.[5] Accordingly, Ms. Boudin is hereby ordered released from administrative detention.

## II. *Contact Visits*

■ This Circuit has held that pre-trial detainees enjoy a First Amendment right to contact visits. *Wolfish v. Levi, supra,* at 126 n.16. This ruling was not appealed to the Supreme Court and accordingly, that holding stands as good law. *See Wolfish, supra,* 441 U.S. at 560, n.40, 99 S.Ct. at 1885. The importance of contact visits to the detainees, their family and to the institution cannot be understated. *See generally, Valentine v. Englehardt, supra; Jones v. Diamond,* 636 F.2d 1364 (5th Cir.), *cert. granted,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 970 (1981); *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.); *aff'd and remanded,* 507 F.2d 333 (2d Cir. 1974). In *Rhem,* Dr. Menninger, a renown psychiatrist, testified that contact visits not only restore decency and humanity to the penal system, but also perform the critical function of reestablishing the prisoner's connection with the world existing outside the prison walls. 371 F.Supp. at 602–03.

The Bureau of Prisons also recognizes the value of contact visits.

The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community. The Warden shall develop procedures consistent with this rule to permit inmate visiting. The Warden shall develop procedures consistent with this rule to permit inmate visiting. The Warden may restrict inmate visiting when necessary to insure the security and good order of the institution. 28 C.F.R. § 540.40 (1980).

. . . . .

(2) Staff shall permit limited physical contact, such as handshaking, embracing and kissing, between an inmate and a visitor, unless there is *clear and convincing evidence* that such contact would jeopardize the safety or security of the institution. Where contact visiting is provided, handshaking, embracing and kissing are ordinarily permitted within the bounds of good taste and only at the beginning and at the end of the visit. The staff may limit physical contact to minimize opportunity for the introduction of contraband and to maintain the orderly operation of the visiting area.

. . . . .

5. The Warden's recent reversal of his prior stand allows Ms. Boudin and Ms. Clark to be together during joint counsel visits. As counsel visits can last a maximum of twelve and one-half hours for seven days a week, Boudin and Clark are no longer effectively separated. This undermines the respondents' position that administrative detention was partially imposed to separate the co-defendants.

I am somewhat puzzled as to why joint legal visits now are permitted. There is no constitutional right to this arrangement. Guilt is supposedly personal and joint visits with counsel would be required only if guilt was collective.

In any event, I am at a total loss to understand why counsel would want to put themselves in a position of "joint counsel visits." A lawyer or group of lawyers can only serve one client. Should there be joint counsel visits then the attorney-client privilege obviously does not cover such visits and the lawyers involved can be called upon to testify about what was said by people other than their own clients. Needless to say, by eliciting such testimony from all of the lawyers, all of the conversation can be discovered.

The only privilege available to a lawyer in a situation would be their Fifth Amendment privilege which might indicate that the clients were being coached to perjure themselves in a manner which would not be contradictory. I fail to see why prison officials would place lawyers in such an untenable position.

28 C.F.R. § 540.51(g)(2) (1980). In the instant case, the MCC has decided that the danger of the passing of contraband outweighs the right of Ms. Boudin to contact visits. *Wolfish* provides that First Amendment rights may be curtailed if the "limited restriction is a rational response by prison officials to an obvious security problem." 441 U.S. at 550, 99 S.Ct. at 1880. The *Wolfish* court also examined alternative means available when ruling on the reasonableness of the MCC "publisher-only" rule.[6] But in this case no alternatives to communication with infants by touch are available. Petitioner has an infant child who cannot yet respond solely to visual contact with his mother. Respondents have presented only vague assertions in their attempt to demonstrate the inherent risks proposed by contact visits.

Of course, all contact visits present security problems. "A naked man in chains poses no risk. From that point on, every increase in freedom brings at least some decrease in security." *Valentine, supra*, at 300–01.

Constitutional rights are at stake, and petitioner has shown, in the absence of contrary evidence, that the deprivation of contact visits with her child is an unreasonable exaggerated response in violation of *Wolfish*. The unreasonableness of respondent's management of this situation is evidenced by Warden Thomas's refusal to permit a contact visit between Ms. Boudin and her son even when petitioner agreed to a strip search of both herself and her son. This proposed alternative would have severely diminished the security risks posed to the MCC while still affording Ms. Boudin the contact visits enjoyed by other inmates. However, the MCC arrantly rejected even this proposal. This is not a rational response to prison security risks. Accordingly, contact visits between Ms. Boudin, her infant child and her approved visitors, are to begin immediately. I defer to the MCC to make such arrangements to comply with

this order in accordance with the needs of prison security.

In sum, the MCC is ordered to release Ms. Boudin forthwith from administrative detention, return her to general population and institute contact visits with Ms. Boudin to conform with this decision.

SO ORDERED.

---

**6.** This allowed inmates only to receive books from outside the prison which were sent by publishers.