**Kathie BOUDIN, Petitioner,**

v.

**Dale THOMAS, Warden of MCC, et al., Respondents.**

**No. 81 Civ. 7190 (KTD).**

United States District Court,
S. D. New York.

June 14, 1982.

Frankfurt, Garbus, Klein & Selz, P. C., New York City, for petitioner Kathie Boudin; Martin Garbus, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for federal respondents; Carolyn Simpson, Asst. U. S. Atty., New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of N. Y., New York City, for state respondents; Eleanor Janosek Doyle, Daniel Kinburn, Asst. Attys. Gen., New York City, of counsel.

Marc L. Parris, County Atty. for the County of Rockland, New City, N. Y., for county respondents; Martin Hurwitz, Asst. County Atty., New City, N. Y., of counsel.

## OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge:

Kathie Boudin is presently charged with various heinous crimes committed in Rockland County, New York and is now in custody awaiting trial. Those in charge of her custody believe that it is necessary to keep her in a high security facility. The jail in Rockland County is far from a secure institution; indeed, colloquially it is referred to as a "sieve." New York State law requires that pretrial detainees be kept in a place separated from convicted persons. N.Y. Correc.Law § 500–c (McKinney's). The confluence of these seemingly disparate facts have led to this, my second opinion in this case. Some familiarity by the reader with my decision dated January 7, 1982 is assumed. *Boudin v. Thomas*, 533 F.Supp. 786 (S.D.N.Y.1982).

On or about October 20, 1981, Kathie Boudin was arrested in connection with the armed robbery of a Brink's armored truck during which one Brink's guard and two Nyack, New York police officers were killed. After the arrest, petitioner was taken to the Rockland County Jail. Concern about the lack of adequate security measures at that institution led the County and State officials to arrange with the United States Attorney for this District to house Ms. Boudin and one of her co-defendants in the Metropolitan Correctional Center ("MCC"), a federal institution in New York City. Plaintiff arrived at the MCC on October 26, 1981 and was immediately placed in administrative segregated detention. She remained in this type of detention until January 7, 1982. The conditions of her confinement were found by me in the first act of this litigation to be as follows:

1. Visits with members of her immediate family are permitted two days a week for a two hour time period;

2. No contact visits are allowed, even with Ms. Boudin's infant child;

3. Attorney visits are permitted any time between 8:00 a. m. and 8:30 p. m. Joint counsel visits are also permitted;

4. Petitioner is confined to her cell, except for the visits described above, for the rest of the day. One hour of recreation per day, consisting of solitary admission to the hall adjoining her cell, is provided;

5. Petitioner has been separated from her co-defendant Ms. Clark since her arrival at the MCC; and

6. Meals are served in her cell.

533 F.Supp. at 788.

On January 7, 1982, two things happened: (1) petitioner was removed by New York

State and Rockland County in the utmost secrecy from the MCC to its Woodbourne Correctional Facility; and (2) since I had received absolutely no notification of Ms. Boudin's removal from the MCC, I filed my first opinion in this matter ordering that facility "to release Ms. Boudin forthwith from administrative detention, return her to general population and institute contact visits with Ms. Boudin . . . ." 533 F.Supp. at 793.

When Ms. Boudin was transferred to the Woodbourne Correctional Facility, she was permitted to amend her complaint to include the State and County respondents in seeking a preliminary injunction requiring the various respondents to remove " . . . plaintiff Kathie Boudin from the conditions imposed at the Woodbourne Correctional Facility, returning her to an appropriate facility placing her in general population, and compelling defendants to treat her in a non-discriminatory manner." Jurisdiction for the petitioner's complaint was based on 42 U.S.C. § 1983, this court's contempt power to enforce the January 7, 1982 habeas corpus order and certain pendent state law claims. The request for preliminary relief, along with various defense motions to dismiss the amended complaint was referred to Magistrate Naomi Reice Buchwald who conducted a three day hearing and issued a Report and Recommendation on April 16, 1982. The petitioner and practically all of the respondents have filed memoranda objecting to some aspect of that Report.

Before discussing any of the objections raised, it is necessary to set out the present conditions of Ms. Boudin's confinement as revealed by the record before me. I do that here not only so the arguments raised by the parties may be seen in context, but also to facilitate the comparison between the present state of affairs and the terms of the almost solitary confinement to which Ms. Boudin was subject at the MCC.

The Woodbourne Correctional Facility is a high grade medium security facility for convicted male prisoners located in the Catskill Mountains. Apparently while Boudin was incarcerated at the MCC, a "special housing unit" was created in Woodbourne to house her and her co-defendants awaiting trial in the Rockland County case. This special housing unit is described by Magistrate Buchwald as follows:

The unit is comprised of eight cells, four cells on each side of the unit with an adjacent exercise area. Four of the cells are used to house the four pretrial detainees with the two males on one side and the two females on the other side. Two of the cells on each side have been converted into so-called "day rooms" equipped with a hot plate, a sink, a radio and a cable television hook-up. The remaining two cells were converted into visiting rooms equipped with tables and chairs. In terms of the physical design of the Woodbourne facility this unit is isolated from the other housing units. Furthermore, this so-called "detention unit" in which Boudin is lodged was designed to separate the detainees from the convicted prisoners, consistent with . . . state law, and accordingly there is a wall separating that unit from the rest of the inmate population on the floor.

Magistrate's Report, pp. 28–29 (citations omitted). The Magistrate also found that the unit had been freshly painted.

The rules and regulations governing the confinement of Boudin were found by the Magistrate to be as follows:

Boudin is allowed out of her cell from 7:30 a. m. until 11:00 p. m. with the exception of a one-half hour lock-up from 3:00 to 3:30 p. m. to accommodate the change of shift of the corrections personnel. During that time petitioner is permitted continuous contact with co-defendant Judith Clark, has access to the exercise yard (when it is not being used by the male detainees) and to the corridor outside the three cells and with escort may be removed from the unit to the visiting room and shower area.

\* \* \* \* \* \*

Petitioner is allowed to receive visitors in the visiting rooms from 9:00 a. m. until

2:30 p. m. and attorneys are permitted to remain until 4:00 p. m. and may return after 6:30 p. m. Petitioner is also permitted joint counsel visits, i.e., the detainees can co-visit with the other pretrial detainees upon the request of any counsel, and when petitioner's child is brought to the facility she and co-defendant David Gilbert, the father of the child can jointly visit with the child. She is allowed unlimited phone calls to her attorneys and allowed one five-minute phone call per day to approved family members or friends. Boudin and the other detainees may receive mail from any person on the approved correspondence list and are permitted to send mail out of the institution; all incoming and outgoing mail is checked for the presence of contraband. There are no restrictions regarding the amount of correspondence that may be received or sent. With the exception of the 35-pound per month limitation for foodstuff packages, applicable to the entire facility, there are not restrictions on petitioner's ability to receive packages. There are also no restrictions on her ability to make purchases at the facility's commissary. Finally, Boudin and the other detainees are permitted to make daily requests for reading materials from the law library and general library based upon catalogues of books provided to them.

Magistrate's Report, pp. 30–31 (citations omitted). The record also reveals that Boudin is provided counselling services on a daily basis and has access to the Woodbourne staff psychologist.

Stripped of all the procedural niceties, the basic questions presented by this matter are whether Ms. Boudin's present confinement is repugnant to the various requirements of the United States Constitution and thus constitutes impermissible punishment and whether the transfer of Ms. Boudin from the MCC to Woodbourne was in violation of my January 7, 1982 order. I will deal with each of these questions but in reverse order.

I agree with Magistrate Buchwald that there is absolutely no showing or proof of any conspiracy among the various respondents to subvert my former order. I further rule that, in any event, there has been no violation of that order. My order of January 7, 1982 was intended to get Ms. Boudin out of the modified solitary confinement in which she was held and to permit her contact visits. Both of these objectives have been accomplished by her transfer to Woodbourne. The order has thus been complied with and no further inquiry into the alleged contempt is really required.

In any event, as I have said, the Magistrate has found that there is no agreement or conspiracy among the various respondents to avoid my former order. Ms. Boudin was held at the MCC pursuant to a comity agreement between the Rockland County District Attorney's Office and the United States Attorney's Office for this District. The federal respondents were not under order to hold Ms. Boudin at the MCC pending resolution of her habeas corpus petition and all parties knew that her transfer from the MCC was possible at any time.

█ Ms. Boudin is not a federal prisoner nor is she detained in federal custody. These facts also defeat the petitioner's contempt motion. Absent an express order, the federal respondents were under no obligation to retain custody of Ms. Boudin. Accordingly, they cannot be held in contempt for releasing the petitioner, and the habeas corpus claim against the federal respondents must be dismissed.[1]

█ Dismissal of the habeas corpus claim against the state and county respondents is also warranted. A state prisoner held in state confinement must be required to exhaust state remedies. 28 U.S.C. § 2254. This requirement of exhaustion of available state remedies will not be wasteful here; rather, it will permit the state system to address its own problems in the first in-

---

1. This same reasoning applies to the petitioner's Section 1983 claim. Accordingly, I affirm Magistrate Buchwald's recommendation that the Section 1983 claim against the federal respondents be dismissed.

stance. To allow Ms. Boudin to avoid exhaustion of her state remedies would pervert the purposes behind the habeas corpus statute. *See Rose v. Lundy*, —— U.S. ——, 102 S.Ct. 1198, 1203–05, 71 L.Ed.2d 379 (1982). This case does not present any unusual or extreme circumstances warranting a short cut of the statute.

Before I turn to the other ultimate question posited above, *i.e.,* whether Ms. Boudin's present confinement is violative of constitutional guarantees, I must digress to comment on the inappropriateness of federal court jurisdiction vested under Section 1983 to pass on questions of the conditions of a state prisoner's custody without affording the state courts the opportunity to resolve such questions in the first instance. *First,* there are a number of state law questions presented by this matter, questions which have not been entirely resolved by the state courts, e.g., whether a county pretrial detainee may be kept in a state prison facility for convicted persons and segregated from the general population of that facility. *Second,* it is unseemly for the federal courts to meddle in state administrative matters where the Supreme Court has already admonished us with regard to federal prisons that:

> Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

> . . . . .

> But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our government not the Judicial.

*Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979). *Third,* the oath that the New York State court judges take requires them to uphold the United States Constitution and is as binding as that taken by the federal judiciary. *Fourth,* the state courts can and do grant prisoners rights which are not mandated by federal jurisprudence. The New York State courts have not only applied the *Wolfish* standard at issue herein to its own prisoners, *Cooper v. Morin*, 49 N.Y.2d 69, 399 N.E.2d 1188, 424 N.Y.S.2d 168 (1979), but they have also exercised their prerogative to afford "a defendant greater rights than those held to be necessary by the United States Supreme Court under similar Federal constitutional provisions." *People v. Teicher*, 73 A.D.2d 136, 138, 425 N.Y.S.2d 315, 317 (1st Dep't 1980). Finding the *Wolfish* analysis inadequate for protection of a defendant's rights, the New York Court of Appeals enunciated a balancing test which weighs "the harm to the individual resulting from the condition imposed against the benefit sought by the government through its enforcement." *Cooper v. Morin, supra,* 49 N.Y.2d at 79, 399 N.E.2d at 1194, 424 N.Y.S.2d at 175. State formulations of prisoners' rights that go beyond minimum constitutional standards should be permitted to govern state institutions. Section 1983 requires me, however, to decide the issue of Ms. Boudin's allegedly punitive confinement solely on federal constitutional grounds. Thus, I am compelled to rule on the incarceration of a state prisoner in state custody despite the state judiciary pronouncements on the instant issue.

There are many other reasons, not the least of which is the crowded dockets of the federal courts and the principles of comity which would indicate that this entire matter properly calls for an application of the doctrine of exhaustion of state remedies. Indeed, the historical bases for primary federal Section 1983 jurisdiction over these cases have in great part eroded over the years. Section 1983, which was originally enacted primarily to combat the Klu Klux Klan, had three principal aims: to override invidious state legislation, to provide "a remedy where state law was inadequate," and to provide "a federal remedy where the

state remedy, though adequate in theory, was not available in practice," *Monroe v. Pape*, 365 U.S. 167, 174–75, 81 S.Ct. 473, 477–78, 5 L.Ed.2d 492 (1961). The rationale supporting Section 1983 and its non-exhaustion requirement is not applicable in the context of the issues presented in this case. There is simply no reason to believe that the alleged violations of Ms. Boudin's constitutional rights cannot be remedied by the state judiciary either in theory or in practice.

But the law has yet to catch up with reality and I am mandated to rule on the issues presented herein even though state judicial channels have not been utilized. *Huffman v. Pursue*, 420 U.S. 592, 609, 95 S.Ct. 1200, 1210, 43 L.Ed.2d 482 (1975); *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961).

The Magistrate's Report recommends that the County of Rockland be ordered to conduct a hearing in accordance with *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) as to why the petitioner is retained in administrative detention. The petitioner objects to the Magistrate's recommendation and urges that the *Wolfish* test be applied to this case to determine whether Ms. Boudin is being punished.

I must reject both views since in my judgment petitioner is not entitled to the relief she seeks. Indeed, I do not find either case to be particularly apposite to the situation at bar; *Wolff* involved convicted state prisoners, and *Wolfish* was a class action involving MCC federal pretrial detainees contesting general conditions applicable to all persons housed at the MCC. Here I am presented with a unique case which will not be repeated unless there is another pretrial detainee who must be treated as an extremely high security risk prior to the reconstruction of the Rockland County Jail.

 It is clear that a state court detainee has no right to pick what jail he or she will be held in until trial just so long as the detainee is not unreasonably hampered in the preparation of the defense of the charge by the assignment to a particular institution. *Cf. Scott v. Smith*, 77 A.D.2d 681, 429 N.Y.S.2d 804, 805 (3rd Dep't 1980) (inmates have no standing to choose place of confinement). Nor do I believe that the petitioner here is entitled to any hearing to contest either the assignment to a high security jail nor her designation as a high security risk. Testimony was taken at the hearing before the Magistrate in which the Sheriff of Rockland County stated his opinion that Boudin required maximum security confinement "based upon his understanding that Boudin was under investigation for involvement in a 1970 Greenwich Village bomb explosion, her association with the Weather Underground, her ten year fugitive status and the present charges against her ...." Magistrate's Report at p. 27. Admittedly much of the bases for the Sheriff's opinion were rank hearsay, but nothing more is required. To require technically admissable proof at a formal hearing of the need for a high security jail for a particular detainee would wreak havoc in our criminal justice system. It would give detainees an unparalleled opportunity for discovery of the prosecutor's files. It would have a chilling effect on people who might be willing to give information on possible escape attempts. And it would serve no legitimate interest of the detainee. I will not enter an order directing such a hearing.

The Magistrate believed that a hearing of some type was necessary in light of *Wolff* since "[b]y definition Boudin is currently held in administrative confinement" Magistrate's Report, p. 58 fn. * and any state prisoner has the right to a due process hearing as to his or her "liberty interest in avoiding administrative segregation ...." Magistrate's Report at p. 63. I disagree. I do not find that Boudin is presently lodged in "administrative detention" or that she is entitled to a due process hearing.

The State of New York has a legitimate governmental interest in segregating pretrial detainees from convicted persons. *See* N.Y.Correc.Law § 500–c (McKinney's); *see also Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir. 1981) (en banc) (confinement of pretrial detainees indiscriminately with con-

victed persons is unconstitutional unless required for jail security). Apparently the Magistrate thought that in this case that Ms. Boudin's placement in an area of Woodbourne that is separated from the population of convicted prisoners deprives Ms. Boudin of a liberty interest to be free of administrative detention. This assumes that petitioner has the right to be in a jail with a large general population of pretrial detainees. There is no such right. If the petitioner was awaiting trial in Hamilton County or some other sparsely populated county in the "Forever Wild" section of the Adirondack Mountains, she might well be in a jail with few if any female prisoners. That would not be cause in and of itself to move her to some other place, nor would there be any violation of the constitution, nor could that be considered "administrative detention."

The petitioner is now held in a small specialized facility which is physically located at the Woodbourne facility but actually is entirely separate from it. That small specialized facility has a general female population of two. Kathie Boudin is free to move about in that general population. Although the parties have referred to this as administrative detention, it does not constitute detention in the pejorative or punitive sense in which the term "administrative detention" is generally used.

In any event the Magistrate believed that New York law requires a due process hearing for any person placed in administrative detention. I do not read the requirements of the regulation promulgated under the New York Corrections Law as broadly as does the Magistrate. Section 7006.1 of the rule promulgated by the State Commission on Corrections which Magistrate Buchwald indicates as being controlling is entitled "General policies on discipline of prisoners." 9 N.Y.C.R.R. § 7000 et seq. However, the detention in this case is not disciplinary or punitive, it is more akin to administrative detention in special transit or handicapped housing units. The admission to such units in the state system is automatic and does not require a hearing. Since in this circumstance the Magistrate based Ms. Boudin's

right to a hearing on state law and I interpret state law not to require a hearing here, I cannot adopt that portion of the Magistrate's Report which would direct the County respondents to hold such a hearing.

■ I turn now to the argument advanced by petitioner that the constitutionality of her present confinement must be gauged by the tests enunciated in the Wolfish case. The Supreme Court restated in Wolfish that a pretrial detainee shall "not be punished prior to an adjudication of guilt in accordance with due process of law." 441 U.S. at 535, 99 S.Ct. at 1871. The Court formulated a two-prong test to use in making determinations of punishment: first, is there evidence of punitive intent on the part of the custodians and second, if no such intent is manifest, are the conditions imposed reasonably related to a governmental objective, or do the conditions themselves constitute punishment. 441 U.S. at 538–39, 99 S.Ct. at 1873–74. In doing so, I refuse to be caught up by the labelling and generalizations advanced by the petitioner. For example, in my first decision I held that the conditions of petitioner's confinement at the MCC were punitive because of the exaggerated response of the prison officials. I did not hold that the situation was the result of a malicious or punitive intent of those officials. A thing may be done improperly from lack of clear thought as well as from malice. But the petitioner assumes that the officials at the MCC were guilty of punitive intent and then by using the labels of conspiracy she suggests that all of the respondents had, and continue to have, a malicious intent to punish the petitioner. Much of petitioner's argument has as its lynchpin this conspiratorial punitive intent. The short answer to this is that there are no facts on which I can find the existence of either the alleged conspiracy or the malicious intent attributed to the respondents by the petitioner's arguments.

Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative pur-

pose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' *Kennedy v. Mendoza-Martinez, supra* [372 U.S. 144] at 168–169 [83 S.Ct. 554 at 567–568, 9 L.Ed.2d 644]; *see Flemming v. Nestor, supra* [363 U.S. 603] at 617 [80 S.Ct. 1367 at 1376, 4 L.Ed.2d 1435]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Ibid.* The Court further elaborated on the applicable test:

This is not to say that the officials of a detention facility can justify punishment. They cannot. It is simply to say that in the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective.

*Id.* at n.20. The gist of petitioner's complaint is that she is in a high security risk detention facility and that there is only one other female detainee in the general population of that facility.[2] As I have already indicated, the placement of Ms. Boudin in a high security risk detention facility and the conditions of her present confinement above are "but an incident of a legitimate non-

punitive governmental purpose" *Wolfish, supra.* As such, there is no constitutional violation. The fact that the female population of the special high risk unit at Woodbourne is small may make it lonely but hardly unconstitututional.

▮ The specific relief sought by petitioner is that she be returned to the MCC and placed in general population. She has no right under federal or state law to be so transferred, and therefore, that relief will not be granted. All of which brings me to the various motions to dismiss filed by the respondents. Since the relief sought by the petitioner will not be granted, the motions to dismiss must be granted.

I have considered the other arguments raised by the petitioner and find them to have even less merit than those discussed above. In doing so, I am mindful that "it is the obligation of the federal courts to be ever alert not to intrude into the affairs of state prison administration unless there is displayed a clear failure by the state to take cognizance of an inmate's valid federal constitutional rights." *Battle v. Anderson,* 564 F.2d 388, 403 (10th Cir. 1977).

Except as modified herein the report of the Magistrate is confirmed.[3] The complaint is dismissed as to all respondents.[4]

SO ORDERED.

2. The other amenities of prison life offered at Woodbourne, i.e., eating in the cafeteria with other inmates or visiting the library, are not available to the petitioner. However, even though her physical movement within Woodbourne is restricted, she is in no other way deprived of the facility's benefits. Books, food, medical attention, modified kitchen facilities and recreation are fully accessible to Ms. Boudin.

3. I must commend the Magistrate for her patience in this matter and remind the bar in

general that the office of the United States Magistrate is a part of this court. Even without specific recommendation this court can and will sanction members of the bar for contemptuous behavior at proceedings before a Magistrate.

4. As this opinion was being finalized I received notification that Ms. Boudin is shortly to be moved to Rockland County for pretrial proceedings. This does not alter my decision in any way.