Susan ROSENBERG, Plaintiff,

v.

Edwin MEESE, III, Attorney General of the United States; Norman Carlson, Director of the Bureau of Prisons; Stephen Grzgorek, Regional Director of the Bureau of Prisons; and Douglas Lansing, Warden of the Metropolitan Correctional Center, New York City, Defendants.

No. 85 Civ. 7634 (PKL).

United States District Court, S.D. New York.

Nov. 27, 1985.

Lubell & Lubell, New York City (Mary K. O'Melveny, of counsel), and Holmes & Tipograph, New York City (Judith L. Holmes, of counsel), for plaintiff.

Rudolph W. Giuliani, U.S. Atty. S.D. New York, New York City (Frederick M. Lawrence, Asst. U.S. Atty., of counsel), for defendants.

## OPINION

LEISURE, District Judge:

This is an action for injunctive relief and damages. Plaintiff Susan Rosenberg ("Rosenberg") is a federal prisoner currently incarcerated at the Metropolitan Correctional Center in New York City ("MCC–NY"). Defendants, who have been sued both in their individual and official capacities, are: Edwin Meese, III, the Attorney General of the United States; Norman Carlson ("Carlson"), the Director of the Bureau of Prisons ("BOP"); Stephen Grzgorek, the Northeast Regional Director of the BOP; and Douglas Lansing, the Warden of MCC–NY.

Plaintiff seeks a preliminary and permanent injunction enjoining defendants, their agents, employees and those acting in concert with them, from designating Rosenberg to any Metropolitan Correctional Center ("MCC"). Plaintiff also seeks a preliminary and permanent injunction enjoining defendants, their agents, employees and those acting in concert with them, from basing any decisions regarding Rosenberg's conditions of confinement, treatment, security classification or designation on unproven allegations of criminal conduct. These claims for injunctive relief are based on the alleged violation of plaintiff's rights under the First, Fifth, Sixth and Eighth Amendments to the United States Constitution. Plaintiff further seeks a declaratory judgment declaring that defendants' actions have violated those constitutional rights. Finally, plaintiff seeks com-

pensatory damages in the amount of $250,-000, as well as punitive damages in the amount of $1,000,000. This Court's subject matter jurisdiction in this action, to the extent it exists, is primarily based on 28 U.S.C. § 1331.[1]

Defendants have moved to dismiss the complaint as moot, and the Court has conducted an evidentiary hearing on plaintiff's motions for injunctive relief. At the present time, the following matters are before me: 1) whether plaintiff's complaint, in whole or in part, has been rendered moot by certain actions of the Bureau of Prisons; 2) whether, as to any claims which have not been rendered moot, a preliminary injunction should be granted; and 3) whether, as to any claims which have not been rendered moot, a permanent injunction should be ordered.

## I. FACTS AND PROCEDURAL BACKGROUND

On November 24, 1982, Susan Rosenberg was named as a defendant in a superseding indictment filed in the United States District Court for the Southern District of New York (SSS 82 Cr. 312) (hereinafter referred to as the "Brinks indictment").

That indictment charged Rosenberg and ten other named defendants with, *inter alia*, participating in a criminal enterprise (allegedly known to its own members as "The Family") in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*[2] Rosenberg herself was charged with two RICO counts (18 U.S.C. § 1962(c), (d) ) and six counts of bank robbery (18 U.S.C. § 2113).[3]

Although a jury trial on the Brinks indictment took place during 1983,[4] several defendants, including Rosenberg, were fugitives from justice and thus were not then tried.

On November 29, 1984, Rosenberg was arrested by the New Jersey police while she and a companion, Timothy Blunk, were attempting to gain access to a storage bin at a public storage facility in Cherry Hill, New Jersey, that Rosenberg had previously rented under an assumed name. Pursuant to a search warrant obtained the night of the arrest, a collection of weapons, explosives and ammunition were discovered in the storage bin, as well as in the car and U–Haul that Rosenberg and Blunk had driven to the facility. *See* Memorandum of

---

1. Plaintiff asserts jurisdiction based on 18 U.S.C. §§ 4042, 4082; 28 U.S.C. §§ 1331, 1361, 2202, 2243; and the First, Fifth, Sixth, and Eighth Amendments. There is no need to evaluate that assertion at this time, except to note that jurisdiction cannot properly be predicated on 28 U.S.C. § 1361, since plaintiff has not specifically sought mandamus relief. *See Persico v. Gunnell,* 560 F.Supp. 1128, 1130 n. 1 (S.D.N.Y.1983).

2. According to the indictment, the objects of the criminal enterprise known as "The Family" included: "the use of violence, murder and threats of violence and murder to commit and to facilitate the commission of robberies and escapes from prison.... [and] [t]he use of proceeds of successful robberies ... to finance a network of ... residences known as 'safe houses,' in which members and associates of [The Family], some of whom were fugitives from justice, would and did reside in [and] used to plan and prepare for the commission of crimes." Brinks Indictment at 2–3.

3. Specifically, Rosenberg was charged with participation in the kidnapping of a prison guard and a prison matron in New Jersey in 1979 in

order to effect the escape of Black Liberation Army Leader Joanne Chesimard (a/k/a "Assata Shakur"); attempting an armed robbery in Nanuet, New York in 1980; attempting an armed robbery in the winter of 1980–81 at a shopping center in Danbury, Connecticut; attempting another armed robbery at a Connecticut shopping center in March, 1981; actually committing an armed robbery in June, 1981 in the Bronx, New York during which a guard, William Moroni, was murdered; and committing the armed robbery in October, 1981 of approximately 1.6 million dollars from an armored truck in Nanuet, New York, during which a Brink's guard and two police officers were murdered. In addition, Rosenberg was charged with helping Marilyn Buck (who had been involved in the October Nanuet robbery and who was at the time a fugitive) to flee from a "safe house" in Mount Vernon, New York. *See* Brinks Indictment at 7–11.

4. Six defendants were tried: Sekou Odinga, Cecil Ferguson, Edmund Lawrence Joseph, William Johnson, Silvia Baraldini and Iliani Robinson. Odinga, Baraldini, Ferguson and Joseph were found guilty on September 3, 1983, and were sentenced on February 15, 1984.

the United States Regarding Sentencing in *United States v. Susan Rosenberg*, 84 Cr. 360 (D.N.J.) ("Presentence Memorandum") at 3–8.[5]

Although the charges in the Brinks indictment were still pending against Rosenberg, she was first tried on charges based on the November, 1984 incident in New Jersey. She and Timothy Blunk were brought to trial before the Honorable Frederick B. Lacey, United States District Judge of the District of New Jersey. On March 17, 1985, she was convicted by the jury of one count of conspiracy to possess firearms, explosives and false identification (18 U.S.C. § 371); three counts of possession of unregistered firearms (26 U.S.C. §§ 5861(d), 5871); one count of carrying explosives during the commission of a felony (18 U.S.C. § 844(h)(2)); and four counts relating to possession of false identification documents and counterfeit Social Security cards (18 U.S.C. § 1028; 42 U.S.C. § 408). On May 20, 1985, Judge Lacey sentenced Rosenberg to the maximum term of imprisonment on each count, a total of fifty-eight (58) years, the terms to run consecutively.

Following the imposition of sentence, Rosenberg was returned to MCC–NY, the same facility in which she had been incarcerated since December 1, 1984. In August, 1985, Rosenberg was informed by a member of the MCC–NY staff that she had been classified as a security level # 4 prisoner, and that she had been designated for incarceration at the Metropolitan Correctional Center in Chicago, Illinois ("MCC–Chicago"). *See* Rosenberg Affidavit in Support of Motion for Preliminary Injunction ("Rosenberg Affidavit") at 9. For the time being, however, she was being held in MCC–NY pending trial on the charges contained in the Brinks indictment.

On August 30, 1985, the government requested that an order of *nolle prosequi* be entered as to the charges pending against Rosenberg that were contained in the Brinks indictment, and this Court (per Duffy, D.J.) granted the government's request.

The government's decision to drop all charges against Rosenberg took her counsel somewhat by surprise, in part because they had anticipated using the time that their client would be on trial for the Brinks charges to consult with her regarding the appeal of her sentence by the New Jersey District Court. Now faced with Rosenberg's imminent transfer from MCC–NY, her counsel sought to postpone the satisfaction of Rosenberg's writ of detainer, since, if the writ were marked satisfied, there would be no obstacle to prevent her from being transferred to another penal institution in another state. On September 12, 1985, this Court (per Haight, D.J.) agreed to postpone satisfaction of the writ until October 1, 1985. *Memorandum and Order*, SSS82 Cr. 312 (CSH) (S.D.N.Y. September 12, 1985). In issuing that Order, Judge Haight stated that "[c]ounsel for Ms. Rosenberg informs me, and the Government does not dispute, that the Bureau of Prisons has designated Ms. Rosenberg to serve [the 58–year sentence imposed by the New Jersey District Court] at the Metropolitan Correctional Center, Chicago." *Id.* at 1.

The good-faith belief of Rosenberg and her counsel, alluded to by Judge Haight, that Rosenberg had been *permanently* designated to MCC–Chicago, was apparently the impetus for the present proceeding,

---

**5.** The government has described the assortment of weapons found as "a veritable arsenal." Presentence Memorandum at 8. The "arsenal" included: a loaded Walther PPK .38 caliber semiautomatic pistol; a loaded Browning 9mm semi-automatic pistol; an Uzi short-barrelled rifle (convertible into a machine gun); a sawed-off Ithaca shotgun; a Sturm Ruger .223 caliber rifle; a Colt Officer's Match .38 caliber revolver; a Dan Wesson .357 caliber revolver; a Colt Model Mark IV series 70 .45 caliber semi-automatic pistol; a Mossberg Model 800A .808 caliber bolt action rifle; and several firearms, such as a Sturm Ruger .357 caliber rvolver, on which the serial number had been removed or obliterated. Substantial quantities of ammunition were also found. *See id.* at 6, 8.

In addition, Rosenberg and Blunk, when caught, were carrying over 600 pounds of explosives, including: 199 sticks of Hercules Unigel Tamptite dynamite; 110 sticks of Dupont Tovex (a high explosive); 24 cartridges of Hercules Slurry, a blasting agent; and a 50-pound bag containing Hercomix, a blasting agent. *Id.* at 9–10.

which is a civil, rather than a criminal, action. On September 26, 1985, Rosenberg's counsel appeared before me with an order to show cause, asking me to grant a temporary restraining order that would enjoin defendants herein, or their agents from transferring her from MCC–NY to any other facility pending determination of her application for a preliminary injunction. In that application, Rosenberg also sought broad injunctive and legal relief, including, *inter alia*, a preliminary and permanent injunction enjoining the Bureau of Prisons from designating Susan Rosenberg to MCC–Chicago or any other MCC facility.

The essence of plaintiff Rosenberg's argument, as I understood it at the September 26 hearing, was that the BOP, by deciding that Rosenberg should serve the duration of her 58–year sentence in a short-term holding facility with severely limited educational and recreational activities,[6] was acting unconstitutionally and was abusing its discretion. In response, however, the government informed this Court that the MCC–Chicago designation was no longer in effect, and suggested that plaintiff's fears of permanent designation to a short-term holding facility were ill-founded.[7] Largely on the basis of such assurances, I declined to grant plaintiff's application for a TRO. I did, however, schedule a hearing in approximately two weeks on plaintiff's motions for preliminary and permanent injunctions (which motions, I suggested, and counsel for both sides agreed, would be consolidated by this Court).

When the parties in the present action appeared before me for a second time on October 10, 1985, I was informed of two significant developments. First, Susan Rosenberg had still not been transferred from MCC–NY, because Judge Haight had, in the interim, extended the date for satisfaction of Rosenberg's writ of detainer to October 14, 1985. *See Order*, SSS82 Cr. 312 (CSH) (S.D.N.Y. September 26, 1985). Second, Rosenberg had been officially designated to a Metropolitan Correctional Center in Tucson, Arizona ("MCC–Tucson").

At the October 10 hearing, it was the government's position that this redesignation to MCC–Tucson was dispositive of the entire matter before me. The government argued that even if, *arguendo*, long-term incarceration of a federal prisoner in MCC–NY or MCC–Chicago was impermissible, designation of Rosenberg to MCC–Tucson was "perfectly appropriate." Transcript of October 10, 1985 Hearing at 10. Arguing that there should be "no magic to the [name] Metropolitan Correctional Center," *id.*, the government contended that the conditions at MCC–Tucson were superior to those at other MCCs, particularly in terms of the opportunities for recreation and education. *See id.* at 9–10.[8]

Notwithstanding the apparent reasonableness of the government's observations, I was not convinced that the indefinite detention of Rosenberg in a short-term holding facility such as an MCC might not eventually raise questions of constitutional magnitude.[9] Because of that concern, and

6. Both MCC–NY and MCC–Chicago are essentially short-term holding facilities. The Bureau of Prisons characterizes the population of both institutions as consisting of "[m]ale and female pre-trial and short-term offenders (less than one year)." United States Department of Justice, Federal Bureau of Prisons, Security Designation and Classification Manual, § 6 at 1, 3.

7. At the September 26 hearing, the government asserted that it was the regular policy of the Bureau of Prisons, for security purposes, not to inform prisoners of their designation or destination before they were moved. This assertion was subsequently qualified, however, by the testimony of a Bureau of Prisons official, Mr. Randy Brachman, before this Court on November 5, 1985. Although it is certainly possible that, in a given situation, the Bureau may

choose not to inform a prisoner of his or her designation, it appears that the Bureau has no blanket policy forbidding such information to be released.

8. The government did not go so far as to state that Rosenberg would be designated to MCC–Tucson indefinitely or for the duration of her sentence. In fact, the government stated that "it would be astounding if anyone were to serve a sentence of [58 years] at a single institution." Transcript of October 10, 1985 Hearing at 19.

9. *See Boudin v. Thomas*, 533 F.Supp. 786 (S.D. N.Y.), *appeal dismissed*, 697 F.2d 288 (2d Cir. 1982) (continued administrative detention of pre-trial detainee in MCC–NY, with no allowance for contact visits, found to be an unreason-

in light of the government's seeming reluctance to designate a woman who had been sentenced to 58 years in prison to any sort of permanent facility, I granted plaintiff's renewed application for a temporary restraining order, thereby enjoining the Bureau of Prisons from transferring Rosenberg from MCC–NY until I had resolved the questions raised by Rosenberg's objections to her indefinite designation to MCC–Tucson.

Once again, intervening events changed the course of these proceedings. On October 25, 1985, the government informed plaintiff's counsel that Rosenberg's designation to MCC–Tucson was only temporary, and that her ultimate designation (upon the completion in early 1986 of facilities currently under construction) would be to the Federal Correctional Institution at Lexington, Kentucky ("FCI–Lexington"). Shortly thereafter, the government moved to dismiss plaintiff's complaint, contending that since the gravamen of the entire complaint was plaintiff's challenge to her (permanent) designation to an MCC facility, the action had been rendered moot by the Bureau of Prison's designation of Rosenberg to the FCI–Lexington.

On November 5, 1985, I conducted an evidentiary hearing on plaintiff's motions for injunctive relief, the main purpose of which was to permit plaintiff to set forth evidence in support of her various claims that defendants had violated her constitutional rights. My findings of fact from that hearing are set forth *infra.*

## II. THE NATURE OF THE RECORD IN THIS CASE

As the preceding section indicates, this litigation has, in a relatively brief period of time, progressed through several stages in various, often unpredictable ways. In the course of these varied proceedings, a substantial evidentiary record has been compiled. That record, which forms the basis for my findings of fact, *infra,* consists of: 1) numerous affidavits and exhibits submitted with the pleadings and motions of the parties;[10] 2) the in-court testimony, given November 5, 1985, of Randy Brachman, the Case Management Coordinator of MCC–NY (called as a witness by plaintiff); 3) Bureau of Prisons Directive 5100.2, known as the Security Designation and Custody Classification System Manual ("Manual"), which sets forth the BOP's policy and guidelines for the designation and classification of federal prisoners; and 4) the BOP's "Central File" on Susan Rosenberg, along with all documents in the Bureau's possession relating to Rosenberg's designation or classification as a federal prisoner.

The production in this case of Rosenberg's Central File and other relevant documents held by the BOP was itself the subject of a legal dispute between the parties, initiated when, at an earlier stage in these proceedings, plaintiff attempted, through counsel, to subpoena her Central File. The subpoena was served at MCC–NY, the institution which currently maintains the BOP's files on Rosenberg. MCC–NY refused to honor the subpoena, apparently because of the MCC's apprehension (based on provisions in the Privacy Act) that it could not lawfully release an inmate's file to a third party absent express authorization by the inmate. *See* 5 U.S.C. § 552a(b); *cf. United States v. Charmer Industries, Inc.,* 711 F.2d 1164, 1175 (2d Cir.1983) (disclosure of a presentence report to a third person should not be authorized by a district court absent a compelling demonstration that disclosure is required to meet the ends of justice). Subsequently, plaintiff argued to this Court that the Privacy Act's "third-party rule" could not reasonably be invoked to frustrate plaintiff's efforts, through counsel, to gain access to her own file.[11] In response, how-

able and unconstitutional practice); *cf. Hewitt v. Helms,* 459 U.S. 460, 477 n. 9, 103 S.Ct. 864, 874 n. 9, 74 L.Ed.2d 675 (1983) ("administrative segregation may not be used as a pretext for indefinite confinement of an inmate").

**10.** By way of illustration, plaintiff's original Order to Show Cause for a Preliminary Injunction

and a Temporary Restraining Order, dated September 26, 1985, contained 6 affidavits and 15 supporting exhibits.

**11.** *Cf. Lynch v. United States Parole Comm'n,* 768 F.2d 491, 498–99 (2d Cir.1985) (federal statute's guarantee of "reasonable access" to documents being used by the Parole Commission

ever, the government argued that other provisions of the Privacy Act made it clear that the Bureau of Prisons was not obligated to release plaintiff's Central File. At that point I agreed to resolve the impasse between the parties by conducting an *in camera* review of Rosenberg's Central File in order to determine which documents contained therein should be released to plaintiff.[12]

After conducting an initial review of the documents submitted, I concluded that a significant portion of the Rosenberg File consisted of matters of public record, such as published newspaper articles. Accordingly, I asked the government to reconsider its broad refusal to release any documents in plaintiff's Central File. Subsequently, the government chose to release all documents in the Rosenberg File with the following exceptions: 1) the pre-sentence report prepared for Judge Lacey at plaintiff's criminal trial in the District Court of New Jersey; 2) the government's pre-sentence memorandum (and appended exhibits) prepared for that same trial; and 3) the official transcript of the sentencing proceedings at that trial. In addition, two documents—a clearance and separatee display and a letter to Judge Lacey from Norman Carlson, the Director of the Bureau of Prisons—were redacted by the government so that references to prisoners other than Ms. Rosenberg did not appear.

On the basis of the government's modified submission, I renewed my *in camera* review in order to determine whether the government was obligated to release any more documents to plaintiff from her Central File. On the day before I completed that review, it came to light that the pre-sentence memorandum and exhibits that

the government was refusing to release to plaintiff had in fact already been made available to her legal advisor at the time of her criminal trial (the documents are also on file with the Clerk of the New Jersey District Court). When this information was brought to the attention of the government, it withdrew its objection to the release of those documents (although the government continued to ask that the pre-sentence report and the transcript of the sentencing proceedings not be released to plaintiff, and to seek the Court's approval of the redactions in two documents).

On November 5, 1985, I formally ruled that the government's refusal to release Rosenberg's pre-sentence report, as well as its decision to redact the names of third parties from two internal documents, were both lawful and proper. I did, however, order the government to release its copy of the sentencing transcript to plaintiff. These rulings were made orally, from the bench; at the time I indicated that I would soon explain in writing the reasons for my decision, particularly with regard to the government's refusal to release plaintiff's pre-sentence report. Accordingly, those reasons are set forth below, as part of the present opinion.[13]

█ In considering whether to compel the government to produce plaintiff's pre-sentence report, I was mindful of the decisions of several federal appellate courts that such reports, once released by a federal district court to the agency whose records are being sought, are agency records subject to the disclosure requirements of the Freedom of Information Act ("FOIA"). *See Berry v. Department of Justice*, 733 F.2d 1343, 1356 (9th Cir.1984);

for decision-making requires that such access be afforded to defendant's counsel as well as to defendant).

**12.** The decision whether or not to conduct an *in camera* review of Rosenberg's Central File appears to rest within this Court's discretion. *See Doherty v. United States Dept. of Justice*, 775 F.2d 49, 52 (2d Cir.1985) (in suits filed pursuant to the Freedom of Information Act seeking disclosure of agency records, federal courts have discretion to conduct *in camera* review).

**13.** Although I generally treated plaintiff's requests for her Central File and related documents as pursuant to the Privacy Act, I would note that at no point in this litigation did plaintiff formally institute a Privacy Act suit. *See* 5 U.S.C. § 552a(g)(1) (individual may bring civil action against federal agency to force compliance with the Privacy Act).

*Lykins v. Department of Justice,* 725 F.2d 1455, 1459–60 (D.C.Cir.1984); *Carson v. Department of Justice,* 631 F.2d 1008, 1009–15 (D.C.Cir.1980). At the same time, the government urged that I was bound by the Second Circuit's decision in *United States v. Charmer Industries, Inc.,* 711 F.2d 1164 (2d Cir.1983), wherein the Court stated that: "[a]s a court document, the presentence report is not within the purview of either the Freedom of Information Act ... or the Privacy Act ... notwithstanding its use or retention by agencies such as the Bureau of Prisons and the Parole Commission." *Id.* at 1167 n. 6. Although plaintiff attempted to distinguish *Charmer* on its facts, neither of the parties alerted me to the fact that the *Charmer* position had been cast into serious doubt by the Solicitor General's recent admission (in a brief to the United States Supreme Court opposing an appellant's petition for a writ of certiorari) that presentence reports *are* agency records within the meaning of the FOIA. The immediate result of that concession was that two cases consistent with *Charmer* were vacated by the Supreme Court and remanded for further consideration in light of the Solicitor General's new construction of the relevant statutes. *See Lindsey v. Bureau of Prisons,* 736 F.2d 1462 (11th Cir.), *vacated and remanded,* — U.S. —, 105 S.Ct. 584, 83 L.Ed.2d 695 (1984); *Crooker v. United States Parole Comm'n,* 730 F.2d 1 (1st Cir.), *vacated and remanded,* — U.S. —, 105 S.Ct. 317, 83 L.Ed.2d 255 (1984). Based on these developments, the First Circuit, on remand, reconsidered its earlier decision and found that a presentence report in the possession of the Parole Commission was not exempt from disclosure under the FOIA. *See Crooker v. United States Parole Comm'n,* 760 F.2d 1 (1st Cir.1985).

Despite all of this judicial activity, this Court was left without a clear indication of how to proceed. The decision in *Crooker* on remand was not enlightening, since it dealt with a prisoner's right to obtain a presentence report that is in the specific possession of the Parole Commission, and is being used in reaching a decision regarding a prisoner's parole. Not only does that issue deal with facts distinct from the case at bar, but the same issue has recently been resolved by the Second Circuit on grounds basically unrelated to the FOIA or the Privacy Act. *See Lynch v. United States Parole Comm'n,* 768 F.2d 491, 498–99 (2d Cir.1985) ("reasonable access" rule of 18 U.S.C. 4208(b) mandates disclosure of presentence report being used by the Commission in a parole decision).

Another element of confusion was caused by the fact that both cases remanded by the Supreme Court were FOIA cases, and it is at least conceivable that presentence reports could be available under the FOIA but not under the Privacy Act. *See Shapiro v. Drug Enforcement Administration,* 762 F.2d 611, 612 (7th Cir.1985). Nevertheless, the recent developments detailed above suggest that it would be imprudent for this Court to find that presentence reports are not agency records within 5 U.S.C. § 552a(a)(4) of the Privacy Act, notwithstanding the prior directive of this Circuit in *Charmer, supra.* I am convinced that the Second Circuit, in light of the history of *Lindsey, supra,* and *Crooker, supra,* would, given the opportunity, readily find that presentence reports are agency records within the meaning of the Privacy Act.

Such a determination, however, leads to yet another question—whether the government should prevail in its argument, raised in its initial submission of the Rosenberg File for *in camera* review, that plaintiff's presentence report is exempt from disclosure under section (j)(2) of the Privacy Act, which specifically authorizes the head of any agency involved with law enforcement activities, to promulgate rules "to exempt any system of records within the agency" from the Act's general requirements of disclosure. 5 U.S.C. § 552a(j)(2).

Under the terms of section (j)(2), the Attorney General has indeed promulgated rules exempting certain systems of BOP records from various provisions of the Privacy Act, including section (d) (which requires federal agencies to permit an individual access to any agency records that

pertain to him). *See* 28 C.F.R. § 16.97 (1984). In particular, the Attorney General has exempted the BOP's "Inmate Central Record System (JUSTICE/BOP–005)" from the Privacy Act's disclosure rules. *See* 28 C.F.R. § 16.97(a)(4). The Inmate Central Record System includes, *inter alia*, records pertaining to "[c]omputation of sentence and supporting documentation," as well as "[i]nformation concerning present offense, prior criminal background, sentence and parole from the U.S. Attorneys, the Federal courts, and federal prosecuting agencies." 49 Fed.Reg. 23,712 (June 7, 1984).

Thus, it appears that the presentence report sought by plaintiff clearly falls within the exempted Inmate Central Record System, particularly as defined in the notice published in last year's Federal Register. *Cf. Turner v. Ralston*, 567 F.Supp. 606 (W.D.Mo.1983) (plaintiff properly denied access under Privacy Act to prison classification study where BOP relied on 28 C.F.R. § 16.97). Accordingly, non-disclosure is proper so long as the exemption relied upon has been adequately justified by the BOP. *See Exner v. Federal Bureau of Investigation*, 612 F.2d 1202, 1204 (9th Cir.1980); 5 U.S.C. §§ 552a(j), 553(c) (agencies are required to set forth, as part of any newly promulgated rules exempting agency records from disclosure under the Privacy Act, the reasons why a particular system of records is to be exempted). I am satisfied that the BOP has set forth adequate reasons for its decision to exempt presentence reports and other Inmate Central Records, *see* 28 C.F.R. § 16.97(b).[14] At the same time, I find that those proffered reasons are simply inapplicable when the particular document requested is a matter

of public record, especially in light of the Bureau's declaration that it will permit limited access to exempted records when such access will not jeopardize agency interests. *See* 28 C.F.R. § 16.97(c). That is why I ordered the government to release the BOP's copy of the transcript of the New Jersey District Court's sentencing of Rosenberg and her cohort Blunk.

Even though plaintiff has preserved its objection to my decision that the BOP need not release its copy of the presentence report,[15] I perceive no reason why my ruling, even if incorrect, has prejudiced plaintiff in the context of these proceedings.[16] Specifically, the opportunity that I have had to review the contents of the presentence report *in camera* has allowed me to honor the request of plaintiff's counsel to consider whether the report includes references to unproven allegations of criminal conduct, specifically, the charges against Susan Rosenberg that were contained in the Brinks indictment. *See* Transcript of November 5, 1985 Hearing at 8. Thus, the presentence report has become part of the record in this case, notwithstanding the fact that plaintiff has been denied access to its precise contents.

## III. DEFENDANTS' MOTION TO DISMISS CLAIM AS MOOT

■ The government's motion to dismiss the complaint as moot is based upon the fundamental principle that the adjudicatory power of a federal court depends upon "the *continuing* existence of a live and acute controversy." *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974) (emphasis in original).

---

**14.** Specifically, the BOP has justified the exemption of the Inmate Central Record System from the Privacy Act's general rule of access upon request because such exemption: "is essential to protect internal processes by which Bureau personnel are able to formulate decisions and policies with regard to federal prisoners, to prevent disclosure to federal inmates that would jeopardize legitimate correctional interests of security, custody, or rehabilitation, and to permit receipt of relevant information from other federal agencies, state and local law enforcement agencies, and federal and state probation and judicial offices." 28 C.F.R. § 16.97(b)(3).

**15.** In addition, I have concluded that the government's redaction (in two of the documents contained in plaintiff's Central File) of information relating to parties other than Susan Rosenberg was entirely consistent with the Privacy Act's express prohibition against unauthorized disclosure of agency records to third persons. *See* 5 U.S.C. § 552a(b); *see also United States v. Charmer Industries, Inc.*, 711 F.2d 1164 (2d Cir.1983).

**16.** *Cf.* Fed.R.Civ.P. 61 (exclusion of evidence, even if in error, should be disregarded if it did not affect the substantial rights of the parties).

The existence of such a controversy at the time the complaint is filed will, standing alone, be insufficient to satisfy the jurisdictional requirements imposed by Article III of the U.S. Constitution; it is necessary that "an actual controversy ... be extant at all stages of review." *Id.* at 459 n. 10, 94 S.Ct. at 1216 n. 10 (citations omitted); *accord, Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976).

In the present case, even a cursory review of the complaint reveals that a significant portion thereof is devoted to plaintiff's allegations that her permanent designation to a short-term holding facility (specifically MCC–Chicago) would create conditions of confinement so onerous as to amount to a violation of her constitutional rights. *See* Complaint ¶¶ 17, 19, 20, 21, 22, 24. Common sense requires the conclusion that the BOP's decision (quite possibly motivated by the institution of this suit) to designate FCI–Lexington as the facility at which plaintiff will formally begin serving her 58–year sentence renders moot any questions concerning the adequacy of conditions at MCC–NY, MCC–Chicago, or MCC–Tucson, or the legitimacy of plaintiff's permanent confinement in any of those facilities.[17] *See Wahl v. McIver,* 773 F.2d 1169, 1173–74 (11th Cir.1985) (§ 1983 action concerning conditions at county jail dismissed as moot once prisoner was moved).[18]

I will not go so far, however, as to hold that the permanent designation of Susan Rosenberg to FCI–Lexington necessitates the dismissal of her entire complaint as moot. Plaintiff's complaint contains broad allegations that her adverse treatment at the hands of defendants, particularly as to her classification as a security-level # 4 prisoner with a "maximum" custody rating, has been in violation of her constitutional rights.[19] These claims have not been rendered moot and, as they arise under federal law, are clearly within this Court's jurisdiction under 28 U.S.C. § 1331. Accordingly, this Court retains jurisdiction over plaintiff's action for preliminary and permanent injunctive relief, and for a declaratory judgment, but only insofar as they deal with defendants' classification of Rosen-

17. It should be kept in mind that plaintiff's objections with regard to the conditions of confinement at MCCs have always emphasized the unconstitutionality of Rosenberg's permanent, or at least indefinite, confinement at an MCC. The affidavits submitted by plaintiff refelect this paramount concern. *See* Rosenberg Affidavit at ¶ 17 (Rosenberg was told by former unit counselor at MCC–NY that she was a "dangerous person" who would "never see the light of day" and who could expect to "spend [her] life being moved from MCC to MCC"); Affidavit of Susan V. Tipograph in Support of Motion for Preliminary Injunction at ¶ 4 (Rosenberg was advised in August, 1985 that the BOP had designated MCC–Chicago as the facility in which Ms. Rosenberg was to serve her 58-year sentence).

In contrast, plaintiff nowhere contends that temporary incarceration at an MCC pending permanent designation elsewhere would, by itself, be unconstitutional. Thus, the mere fact that Rosenberg will be incarcerated at MCC–Tucson until early 1986 does not revive the controversy concerning the permissibility of the indefinite confinement of a long-term offender (such as plaintiff Rosenberg) at an MCC.

18. Plaintiff has recently suggested that her anticipated incarceration at FCI–Lexington is "likely to represent a constitutionally improper designation," Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 7. Yet the facility in question has not yet been completed; indeed, the conditions which plaintiff speculates might be unconstitutional *do not yet even exist.* Thus, the question of whether Rosenberg's confinement at FCI–Lexington might be constitutionally unacceptable, even if plaintiff were to raise it formally by amending her complaint, is a matter not yet ripe for decision. *See Pacific Gas & Elec. Co. v. Energy Resources Comm'n,* 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) purpose of ripeness doctrine is, through avoidance of premature adjudication, to prevent judicial entanglement in abstract disagreements, and "'to protect ... agencies from judicial interference until an administrative decision has been formalized and *its effects felt in a concrete way by the challenging parties'* " (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)) (emphasis added).

19. *See* Complaint ¶ 27 (alleging violation of Fifth Amendment right to due process and equal protection); *id.* ¶ 29 (alleging violation of First Amendment rights); *id.* ¶ 30 (alleging violation of Fifth and Sixth Amendment rights); *id.* ¶ 32 (alleging discriminatory treatment based on gender in violation of Fifth Amendment rights).

berg as a security level # 4 prisoner with a "maximum" custody rating.

Plaintiff's claim based upon the alleged violation of Rosenberg's Fifth and Eighth Amendment rights caused by defendants' designating her to MCC–Chicago, see Complaint ¶ 28, is hereby dismissed as moot. Likewise, plaintiff's claim that defendants committed a gross abuse of discretion in designating Rosenberg to MCC–Chicago, is dismissed as moot. In so ruling, I do not mean to suggest that these claims, were they not moot, would have been successful. As the government has argued in these proceedings on several occasions, duly convicted prisoners have no right to choose their prison, and the discretion of prison officials to transfer inmates as they see fit is extremely broad. This is true not only as to the transfer of inmates within the federal prison system, see Persico v. Gunnell, 560 F.Supp. 1128, 1133 (S.D.N.Y.1983) (Motley, C.J.) (federal prisoners may be incarcerated at any of the facilities at which their confinement is authorized under 18 U.S.C. § 4082), but also as to the intrastate transfer of prisoners by state prison authorities, see Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976) (inmate's due process rights are not infringed by transfer from one prison to another within the State, even in the absence of a pretransfer hearing, unless the inmate has some additional right or expectation rooted in state law); Meachum v. Fano, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976) (the Due Process Clause in no way restricts the discretion of state prison officials to transfer prisoners "for whatever reason or for no reason at all"). See also Kivela v. United States Attorney General, 523 F.Supp. 1321, 1324–25 (S.D.N.Y.1981) (Weinfeld, D.J.), aff'd mem., 688 F.2d 815 (2d Cir.1982) (dismissing petition challenging prisoner's transfer from Vermont correctional facility to federal BOP facility in New York).[20]

█ Finally, as I have already stated, plaintiff's complaint is moot as to any and all allegations regarding conditions at MCC–NY, MCC–Chicago, or MCC–Tucson. Moreover, even if plaintiff alleges that the conditions of her confinement at MCC–NY have been unconstitutionally punitive, the need to enjoin BOP officials and MCC–NY staffers from continuing to engage in unlawful conduct is mooted by Rosenberg's imminent transfer from MCC–NY. Past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse effects. O'Shea v. Littleton, 414 U.S. 488, 495–496, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974); accord, Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir.1985); Diotte v. Blum, 585 F.Supp. 887, 895 (N.D.N.Y.1984) (Miner, D.J.).

---

20. Plaintiff points out that although the discretion of prison officials to transfer inmates is ordinarily unfettered, transfers that have been clearly made in retaliation for a prisoner's exercise of First Amendment rights have, on occasion, been ruled invalid. See Morrison v. Lefevre, 592 F.Supp. 1052, 1075 (S.D.N.Y.1984) (citing Hohman v. Hogan, 597 F.2d 490, 493 (2d Cir.1979)); see also Haymes v. Montanye, 547 F.2d 188, 191–92 (2d Cir.1976), cert. denied, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977) (prisoner must be afforded opportunity in trial court to prove that his transfer was ordered in retaliation for protected First Amendment rights). Plaintiff fails to distinguish, however, between those First Amendment rights that are protected within prison walls, such as the right to seek redress in the courts, see Hohman, supra, and those First Amendment rights—mainly associational in character, such as the right to promote a labor union—which may be negated within prison walls because they are inconsistent with legitimate penological objectives, see Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125–26, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977).

In any event, the claim that Rosenberg's transfer to MCC–Chicago was a punishment for the exercise of her First Amendment rights is moot because Rosenberg is no longer going to Chicago. Likewise, the claim that Rosenberg's permanent designation to an MCC facility was punishment for the exercise of First Amendment rights is moot because Rosenberg is no longer permanently designated to an MCC. To the extent that plaintiff also alleges that her continued classification as a security level # 4 prisoner is itself a form of retaliation for the exercise of First Amendment rights, plaintiff raises a cognizable claim that will be dealt with infra.

## IV. PLAINTIFF'S DEMAND FOR PRE-LIMINARY INJUNCTIVE RELIEF

The following Findings of Fact and Conclusions of Law are set forth pursuant to Fed.R.Civ.P. 52(a).

### A. *Findings of Fact* [21]

1. The facts set forth in Part I of this opinion, *supra*, are hereby incorporated into these Findings of Fact.

2. A copy of the presentence report submitted to Judge Lacey in *United States v. Susan Rosenberg*, 84 Cr. 360 (D.N.J.), as well as a copy of the presentence memorandum submitted by the government in that case, are kept in BOP files. For the purposes of this opinion, it is presumed as a matter of fact that the BOP has considered and will continue to consider the contents of both the presentence report and the presentence memorandum in making prisoner classification decisions regarding Susan Rosenberg.

3. Both the presentence report and the presentence memorandum contain references to the Brinks indictment, and to the charges contained in that indictment that were pending against Rosenberg at the time that the report and the memorandum were filed with the New Jersey District Court. Since the United States government has chosen not to prosecute Rosenberg on those charges, said charges now amount to unproven allegations of criminal conduct. Accordingly, for the purposes of this opinion, it is presumed as a matter of fact that the BOP has considered unproven allegations of fact in making classification decisions with regard to Susan Rosenberg.

4. During the course of her sentencing by the New Jersey District Court on May 20, 1985, Susan Rosenberg made the following statements to the Court:

When we were first captured we said, we're caught, we're not defeated, long live the armed struggle. We'd like to take this moment to rededicate ourselves to our revolutionary principles.... Tran-script of May 20, 1985 Sentence Proceedings ("Sentence Proceedings") at 15.

From my own experiences in the armed clandestine movement and now in prison, I know that the most important struggle that we are in, and that I am in, and that we continue to be in, are our revolutionary principle and practice versus [the] bourgeois system, its idealogy [sic] and individualism and opportunism. To deepen our commitment to revolution, to be willing to change ourselves, to become imbued with proliterian [sic] internationalism, to learn how to fight, to become guerillas with Communist theory and practice, and to consolidate a revolutionary resistance, those tasks go on everyday and in every decision and in every action that we take.

In a non-revolutionary time and a non-revolutionary period, it's very very hard to be a revolutionary. The decision to build an armed clandestine organization and the advancement of that, the lessons that are being learned in clandestinity are what most deeply challenged all of us. *Id.* at 21.

For Tim [Blunk] and myself we begin a long struggle alongside other captured comrades as political prisoners. We will continue to struggle and to fight and to resist. *Id.* at 23.

5. Decisions regarding Rosenberg's designation within the federal prison system, at least since she was designated to MCC–Tucson in June, 1985, have been made by the Central Office of the Federal Prison System in Washington, D.C. *See* Declaration of Randy Brachman in Support of Motion to Dismiss ("Brachman Declaration") ¶¶ 6, 7; Transcript of November 5, 1985 Evidentiary Hearing ("Hearing Transcript") at 24. In the experience of Randy Brachman ("Brachman"), Case Management Coordinator of MCC–NY, approximately 5% of all inmate designations within the federal prison system are directed by the Central Office. *Id.* at 80–81.

---

**21.** Certain findings of fact relating to the BOP's designation of Susan Rosenberg have been in-cluded for the sake of clarity and completeness.

6. Brachman was told by Deputy Assistant Director of the BOP, Al Turner, that BOP Director Carlson had personally caused Rosenberg's designation to MCC–Tucson "based on a letter he had received from Judge Lacey [dated May 21, 1985]." *Id.* at 25. Turner also told Brachman that the Central Office staff had decided, based on documents received from New Jersey (essentially the sentencing memorandum and presentence report which are now in Rosenberg's Central File) "to agree with a statement made by Judge Lacey in a letter to the director [Carlson] that she [Rosenberg] constituted a serious security risk in any institution." *Id.* at 30–31.[22]

7. BOP Director Carlson's letter to Judge Lacey, dated June 3, 1985, demonstrates that Carlson's decision-making process as to Rosenberg's designation was clearly influenced by Judge Lacey's letter of recommendation.[23]

22. Judge Lacey's letter to the BOP, dated May 21, 1985, deals with the Judge's recommendations regarding Rosenberg's prospective parole and designation. The letter is retained by the Bureau in its files on Rosenberg; a copy of the letter was released to plaintiff in the course of these proceedings, and was subsequently introduced as Plaintiff's Exhibit # 1 at the November 5, 1985 Evidentiary Hearing in this case. The letter states:

Recommendation: In imposing the term sentences under 18 U.S.C. § 4205(a), which mandates that a defendant becomes eligible for parole after serving ⅓ of his or her term, or after serving 10 years of a sentence of over 30 years (except to the extent otherwise provided by law), I stated in court on the sentencing, as I do now, that it will be a terrible mistake if these defendants [Rosenberg and Blunk] were to be released from prison after serving only 10 years if their attitude then is as it is now. As I further stated: "This is because without doubt ... [they] will, if it serves ... [their] cause, kill, main [sic] and destroy, just as ... [they] would have done here if not caught." Also, addressing the defendants I said as follows: "The authorities making such a decision, that is, to release you, would bear the responsibility for the lives taken and damage you do if [you are] released" given the "same disposition toward our nation and society" that the defendants now have.

On sentencing, the defendants exhibited no remorse. To the contrary, they exhorted their followers who were present in court to carry on the "armed revolution". Indeed, the defendant Rosenberg intimated that the only reason that she and her co-defendant, Blunk, had been "captured" was because they had momentarily forgotten that they were "revolutionaries". The only inference that could be drawn was that she was telling her followers that if she had shot and killed the arresting officer she would not have been captured.

Thus I recommend that they not be released at the end of the period provided for under § 4205(a).

Turning now to § 4205(d), again it must be remembered by whoever is making the decision at that time who these people are. Prior to sentencing, they stated that they expected to go to jail and that in jail they would radi-

calize the prison. There obviously is no way of predicting what their disposition will be this far into the future. Nonetheless, the decision-makers will have to act carefully and responsibly, and consider the consequences to innocent people, if it should develop that they made a mistake in an early release.

As to the place of incarceration [information relating to third parties omitted, though not redacted in copy of letter released to plaintiff], I am sure the Bureau of Prisons will make certain that Rosenberg does not profit from the same mistake that was made as to [a purported associate of Rosenberg's who escaped]. Careful consideration must be given to the security of any prison to which Rosenberg is sent. She is under indictment in the Southern District of New York, charged with aiding in the prison escape of Joanne Chesimard. I cannot emphasize too much the fact that a minimum-security prison will not hold Rosenberg. I say this notwithstanding the fact that I recognize that the federal prison system is limited in its ability to deal with female inmates. I would suggest that careful consideration be given to confining her in a state prison under adequate security, pursuant to contract.

/s/ FREDERICK B. LACEY
FREDERICK B. LACEY
UNITED STATES DISTRICT JUDGE

23. Carlson's letter, dated June 3, 1985, is included in the BOP's files on Rosenberg and was introduced as Plaintiff's Exhibit # 2 at the November 5 Evidentiary Hearing in this case. The letter (as redacted by the BOP with Court approval) states:

Dear Judge Lacey:

I appreciated your letter of May 21, 1985, concerning the designation of Susan Rosenberg and [name deleted].

On a temporary basis, we are sending Ms. Rosenberg to the Metropolitan Correctional Center in Chicago. I have alerted the Warden to the threat she presents. From there we will make further designation, hopefully to a secure state prison facility.

If not, we are in the process of developing new, secure units for female offenders at the Federal Correctional Institutions in Lexing-

8. The BOP has established a general procedure for making designation decisions; that procedure may be summarized as follows:

designation of an institution for receipt of a particular inmate involves two steps: a) completion of a Security Designation Form, which specifies the security needs of the incoming offender; and b) consideration by the Regional Designator of several management variables: age, Central Inmate Monitoring assignment, release residence, judicial recommendation, degree of overcrowding, racial balance, sentence limitations, and additional considerations.... Manual, § 2, p. 1.

9. Designation decisions may be based in part on materials contained in an inmate's Central File. Hearing Transcript at 42. In making a designation decision, the BOP may also consider other sources of information, such as "phone calls, newspapers [or] any other source of information that ... the Bureau of Prisons [has]." *Id.* Information regarded as significant is verified to the satisfaction of the BOP. *Id.*

10. Brachman knows of no instance where an inmate's political beliefs have been considered by the BOP in making a designation decision. *Id.*

11. Federal prisoners are classified by the BOP according to security levels, ranging from level #1 to level #5, with #5 representing the highest security risk. *Id.* at 54–55.

12. An inmate's security level is one factor in deciding to which penal institution or facility the inmate should be designated. The management of the BOP, however, acting within its discretion, sometimes designates an inmate to an institution or facility that normally houses inmates with a higher (or lower) security level. In essence, there is no absolute correlation between the security level of an individual prisoner and the security level of the insti-

tution at which he or she is incarcerated. *See id.* at 55, 57.

13. Classification and designation decisions by the BOP are each based in part on information contained in a prisoner's "Inmate Profile" and "Security/Designation" form, both of which are entered in the BOP's "Sentry" computer and which can be produced in the form of a computer printout. *See id.* at 48–51. Indeed, a one-sheet printout of Rosenberg's "Inmate Profile" and "Security/Designation" form, dated September 10, 1985, was located in Rosenberg's Central File.

14. Rosenberg's Security/Designation form, as printed out on September 10, 1985, contains certain "Remarks," indicating that Rosenberg had been convicted of an offense relating to the stockpiling of large amounts of explosives to be used in terrorist activities. The Remarks also refer to a pending indictment in the Southern District of New York (the Brinks indictment). Finally, the Remarks indicate that Rosenberg is associated with the Black Liberation Army, the FALN, and various communist groups. *See* Plaintiff's Exhibit #3 at November 5, 1985 Evidentiary Hearing; Hearing Transcript at 60.

15. Rosenberg's Security/Designation form, as printed out on September 10, 1985, included the listing "Detainer: Greatest," *see* Plaintiff's Exhibit #3 at November 5, 1985 Evidentiary Hearing, meaning that "there was either a detainer or pending charge for an offense which falls into the greatest severity in a list which is contained within the manual." Hearing Transcript at 52.

16. The basis for the listing "Detainer: Greatest" on Rosenberg's Security/Designation form, as printed out on September 10, 1985, was presumably the charges from the Brinks indictment, or the outstanding detainer relating to those charges. *See id.* at 52.

ton, Kentucky and Tucson, Arizona. These will be units that hopefully will provide a high level of security for female offenders such as Ms. Rosenberg.
[two lines of text deleted].

Thanks for calling these cases to my personal attention.
Sincerely,
NORMAN A. CARLSON
Director

17. A federal prisoner's security level is based on a "security total" listed on the prisoner's Security/Designation form. *See id.* at 55.

18. According to Rosenberg's Security/Designation form, as printed out on September 10, 1985, her security total was 17. Of those 17 points, 7 were based on the listing "Detainer: Greatest." *See id.* at 53.

19. A federal prisoner with a security total of 17 would be classified as a security level # 4 prisoner. *See id.* at 55. A Federal prisoner with a security total of 10 would be classified as a security level # 3 prisoner. *See id.* at 56.

20. Rosenberg's Security/Designation form, as printed out on September 10, 1985, indicates that BOP management retained the authority to designate Rosenberg to a penal institution or facility "other than the specific security level facility which the form indicates." *Id.* at 63. The reason specified on the Security/Designation printout is "Additional Considerations." *See id.* at 63–64.

21. The BOP Security Designation and Custody Classification Manual specifically contains a list of "additional considerations" that includes: mental health, aggressive sexual behavior, deportable alien, threats to government officials, greatest severity offense, high severity offense, RICO offenses, and membership in a "disruptive group." *See id.* at 66–67.

22. Rosenberg does not belong to a "disruptive group" as that term is specifically defined by the BOP. *See id.* at 67–70.

23. "Additional considerations" could include charges pending against a prisoner for a greatest or high severity offense, or for a RICO offense. *See id.* at 67.

24. The term "additional considerations" is also used by the BOP in the same non-specific manner that it is used in the English language. *See id.* at 76. This means that BOP management could conceivably base a designation determination partly on "additional considerations" other than those listed in the Manual. *See id.* at 77.

25. As a practical matter, the designation guidelines which adequately cover male prisoners may be less applicable to situations involving female prisoners, since designations of female prisoners are limited by the small number of institutions at which females are incarcerated. *See id.* at 82; *see also id.* at 35 (fact that Rosenberg is female was probably a factor in her designation).

26. Rosenberg's Security/Designation form, as printed out on September 10, 1985, contains the listing "Custody: Maximum." *See* Plaintiff's Exhibit # 3 at November 5 Evidentiary Hearing. This custody classification "is for individuals who by their behavior have identified themselves as assaultive, predacious, riotous, serious escape risks or seriously disruptive to the orderly running of the institution." Manual, § 3, p. 1.

27. While incarcerated at MCC–NY, Rosenberg was found guilty, after an administrative hearing, of an institutional infraction. *See* Hearing Transcript at 87, 92–93.

28. Rosenberg's Security/Designation form, as printed out on September 10, 1985, contains the listing "Escape: None," meaning that she has no prior history of having been convicted for, or having participated in, a prison escape. *See id.* at 91–92.

29. Upon her arrival at MCC–NY, Rosenberg was placed in administrative segregation "pending classification." *See* Plaintiff's Exhibit # 9 at November 5 Evidentiary Hearing. The BOP document which reflects that information, dated November 30, 1984, also contains the following comments about Rosenberg: "Individual was on FBI 10 most wanted list for many years and is a member of Weather men terrorist group and connected to Brinks robberies." *Id.; see* Hearing Transcript at 113.

### B. *Conclusions of Law*

Before this Court may properly grant plaintiff's prayer for preliminary injunctive relief, it must be shown that the injunction is necessary to prevent irreparable harm

and that plaintiff is likely to prevail on the merits of the underlying controversy. In the alternative, plaintiff may demonstrate irreparable injury coupled with the presence of sufficiently serious questions going to the merits as to make them a fair ground for litigation, along with a balance of hardships tipping decidedly in plaintiff's favor. *See, e.g., Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985); *Arthur Guiness & Sons, PLC v. Sterling Publishing Co.,* 732 F.2d 1095, 1099 (2d Cir.1984); *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 54 (2d Cir. 1979).[24]

Proof by the movant of irreparable harm is "an absolute requirement for an award of injunctive relief." *American Postal Workers Union, AFL–CIO v. United States Postal Service,* 766 F.2d 715, 723 (2d Cir.1985); *see Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983). Accordingly, plaintiff has argued that the deprivation of a prisoner's constitutional rights, in and of itself, amounts to irreparable harm. *See Wali v. Coughlin,* 754 F.2d at 1026; *Fortune Society v. McGinnis,* 319 F.Supp. 901, 903 (S.D. N.Y.1970). But this assertion begs the fundamental question, *viz.,* whether plaintiff has in any way shown a deprivation of her constitutional rights.

In considering claims based on alleged violations of a federal prisoner's constitutional rights, it is necessary for this Court to keep in mind the special nature of those rights. Essentially, the United States Supreme Court has indicated that federal prisoners are entitled to enjoy the full ambit of constitutional freedoms, provided only that such freedoms are not inconsistent with the legitimate objectives of prison officials and penological institutions. *See, e.g., Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

Within this framework, certain constitutional rights of prisoners, such as the Fourth Amendment right to be free from unreasonable searches and seizures, may

become sharply limited. *See Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3198–3202, 82 L.Ed.2d 393 (1984). On the other hand, certain other rights, such as the right of access to the courts, remain rights that are cherished and protected to the utmost even within prison walls. *See Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977).

Thus, when a prisoner asserts a constitutional right, the court should initially determine the precise nature and scope of that right. Once the nature of the right has been defined, the court must evaluate the conduct of prison officials which gave rise to the prisoner's grievance, in order to determine whether those officials have indeed trammeled on protected constitutional liberties.

In addition, courts do not consider the conduct of prison officials in a vacuum. Rather, courts have traditionally recognized the especial difficulties of maintaining security and order within prison walls. Such recognition has led to the adoption of a general rule of judicial deference to the needs of prison administration. *See, e.g., Martin v. White,* 742 F.2d 469, 473 (8th Cir.1984) (citing Supreme Court cases). The Second Circuit has emphasized, however, that the obligations of judicial review mandate that this rule of deference should never be used to justify an absolute "hands off" approach. *Wali v. Coughlin,* 754 F.2d at 1029.

With the foregoing broad strokes as background, I will now proceed to detail and evaluate plaintiff's constitutional claims in order to determine whether a preliminary injunction should be granted in whole or in part.

#### 1. *Fifth Amendment Claims*

Plaintiff claims that defendants' treatment of her has violated her Fifth Amendment rights to due process and equal protection. Since defendants' designation decisions regarding Rosenberg as well as

---

**24.** Because the injunctive relief sought by plaintiff is prohibitive in nature, she need not satisfy the greater burden of proof required by a party

seeking a mandatory injunction. *See generally Wali v. Coughlin,* 754 F.2d at 1025–26.

their treatment of her during her incarceration at MCC–NY are not being considered by this Court (for the reasons stated in Part III of this opinion, *supra*), the conduct that is actually being challenged in this litigation is defendants' classification of Rosenberg as a security level # 4 prisoner with a "maximum" custody rating.[25] Thus refined, plaintiff's various constitutional claims are confronted with a seemingly insurmountable obstacle, *viz.*, the disinclination of federal courts to interfere with a classification decision by prison officials. *See, e.g., Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir.1984) (prison administrators making classifications need only show a rational basis for those decisions); *Hoptowit v. Ray*, 682 F.2d 1237, 1256 (9th Cir.1982) (misclassification of prisoners does not violate Eighth Amendment); *Solomon v. Benson*, 563 F.2d 339, 343 (7th Cir.1977) (federal prisoner has no pre-classification right to procedural due process, notwithstanding that classification often "adversely affects an inmate's eligibility for transfers, furloughs and minimum security programs.").

(a) *Due Process*

In *Pugliese v. Nelson*, 617 F.2d 916 (2d Cir.1980), the Second Circuit directly considered the question of whether a federal prisoner was entitled to procedural due process prior to being classified by the BOP as a "Central Monitoring Case" ("CMC"). *Id.* at 918. Initially, the Court noted that CMC classification could hinder or preclude a prisoner from obtaining various benefits—such as furloughs, work releases, or preferred transfers—that were more readily available to prisoners who had not been so classified. *See id.* Yet, while the Court acknowledged the "substantial" effect of CMC classification, *see id.* at 919, it also found that "[u]nder Title 18 U.S.C. §§ 4081 and 4082 the Attorney General has complete and absolute discretion with respect to the incarceration, classification and seg-

regation of lawfully convicted prisoners." *Id.* at 923; *accord, Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976).[26] Accordingly, the Court determined that "a prisoner's mere expectation of benefits associated with non-CMC status does not amount to a statutory or constitutional entitlement sufficient to trigger due process protections." *Pugliese v. Nelson*, 617 F.2d at 925; *see Moody v. Daggett*, 429 U.S. at 88 n. 9, 97 S.Ct. at 279 n. 9 (prisoner's interest in his classification and eligibility for rehabilitative programs is not sufficient to invoke due process).

The validity of Rosenberg's due process claim is also called into question by the Second Circuit's recent decision in *Sher v. Coughlin*, 739 F.2d 77 (2d Cir.1984), which suggests that classification decisions based, at least in part, on "administrative, non-punitive reasons" do not impair a prisoner's protected liberty interests and remain within the unfettered discretion of prison officials. *See id.* at 81–82. In *Sher*, the Court affirmed a district court's dismissal of a § 1983 claim based on a prisoner's challenge to his transfer from the general population of the Auburn Correctional Facility to the Reclassification Unit of the Attica Correctional Facility. *Id.* at 78–79. At the outset, the Court held that plaintiff's transfer from one prison facility to another did not impair any liberty interest belonging to plaintiff. *Id.* at 80 (citing *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)). Next, the Court considered the narrower question of whether the decision of New York State prison officials to place plaintiff in restrictive confinement within a "reclassification unit" had violated plaintiff's right to due process. The Court found that, absent a substantive limitation created by state law, prison officials "retain unfettered discretion to assign [a prisoner] for non-punitive reasons." *Id.* at 82. Applying that princi-

**25.** As a practical matter, of course, Rosenberg's security level and custody classifications are likely to have some effect, though not a dispositive one, upon her subsequent designations within the federal prison system. *See, supra,* Finding of Fact ¶ 12.

**26.** The Court also noted that the Attorney General's broad discretionary authority has been delegated by statute to the Bureau of Prisons. *Pugliese v. Nelson*, 617 F.2d at 923 n. 5; *see* 28 C.F.R. §§ 0.95, 0.96 (1984).

ple to the facts in *Sher* (which revealed that prison officials might have had a "dual motivation" for placing plaintiff in Attica's reclassification unit), the Court found that where a prisoner's placement in restrictive confinement has both a punitive *and* an administrative, non-punitive basis, the placement decision will not be found to have impaired a protected liberty interest. *Sher v. Coughlin,* 739 F.2d at 81–82; *cf. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

■ Applying *Sher* by analogy to the case at bar,[27] it is apparent that no protected liberty interest of plaintiff Rosenberg has been impaired by the BOP's classification of her as a security level # 4 prisoner with a "maximum" custody rating. The BOP clearly possessed a legitimate, non-punitive reason for such classifications. Rosenberg's security level properly reflected the seriousness of the weapons charges for which she had been convicted by the New Jersey District Court. As to Rosenberg's custody classification, it is manifestly justified by the BOP's internal regulations, which prescribe the "maximum" classification "for individuals who have by their behavior have identified themselves as assaultive, predacious, riotous, serious escape risks or seriously disruptive to the orderly running of the institution." Manual, § 3 at 1; *see* Finding of Fact ¶ 26. Notwithstanding the objections of plaintiff's counsel to the applicability of those standards to Susan Rosenberg, *see* Hearing Transcript at 89–93, the obvious fact remains that the plaintiff in this case has been convicted of serious weapons offenses (related to possession of large quantities of unregistered firearms and explosives) which could reasonably have led prison officials to characterize her as "assaultive." Furthermore, the fact that Rosenberg was a fugitive with regard to the

Brinks indictment for two years leading up to her arrest in New Jersey in November, 1984 undoubtedly represents behavior that identifies Rosenberg as a "serious escape risk." *See* Hearing Transcript at 93.[28] Finally, while at MCC–NY, Rosenberg committed an institutional infraction that at least arguably established her to be "seriously disruptive to the orderly running of [an] institution." *See* Hearing Transcript at 91.

Thus, the record in this case clearly supports the conclusion that the BOP had an "administrative, non-punitive" justification for its security level and custody classifications of Susan Rosenberg, so that the BOP cannot be said to have violated Rosenberg's right to due process by means of that classification. *See Sher v. Coughlin,* 739 F.2d at 81. Even assuming that the facts in this case could conceivably be stretched so far as to yield the inference that the BOP had an improper "punitive" reason for its classification of Rosenberg, it does not necessarily follow that Rosenberg's due process rights have been violated. In this case, there is "no doubt that the [proper] administrative reasons relied on by the defendants would have caused them to [classify Rosenberg as they did], whether or not they also entertained thoughts of imposing some form of [improper] discipline." *See id.* at 82.

Plaintiff has set forth two additional variations on her general claim that the BOP's classification of Susan Rosenberg did not comport with due process. First, plaintiff argues that she was denied due process because the BOP acted outside its own internal guidelines in its decision to classify Rosenberg as a security-level ¶b 4 prisoner with a "maximum" custody rating. I have already indicated, however, that the record suggests the contrary conclusion, that the BOP has classified Rosenberg in a manner

**27.** Since a placement decision has a more direct impact upon a prisoner than does a classification decision, it follows that the classification decisions challenged in the case at bar would not implicate any liberty interest greater than that implicated by the placement decision challenged in *Sher v. Coughlin.*

**28.** There was also testimony to the effect that Rosenberg's length of sentence and serious offenses in and of themselves established her potential for escape. *See* Hearing Transcript at at 92.

consistent with the criteria set forth in the Manual. The only possible exception to that finding of rectitude is the inclusion of the listing "Detainer: Greatest" in the September 10, 1985 printout of Rosenberg's Security/Designation form. It is argued that such a listing was (and remains) inaccurate because the charges against Rosenberg arising out of the Brinks indictment are no longer pending, and that the continued inclusion of a "Detainer: Greatest" listing in plaintiff's records prejudices her by causing her security total to be 17 instead of 10, which in turn causes her security level to be # 4 instead of # 3. *See* Findings of Fact ¶¶ 18, 19.

On the one hand, it is possible that the "Detainer: Greatest" listing in the September 10 printout was inadvertent, resulting merely from the fact that, less than two weeks after the Brinks charges had been dropped against Rosenberg, the Bureau had not yet received official confirmation of that fact from the United States Attorney's Office. *See* Hearing Transcript at 53. On the other hand, it is entirely possible that the listing was accurate as of September 10, since the listing signifies not only pending charges, but also the existence of "a detainer ... for [a greatest severity] offense." Hearing Transcript at 52. Ironically, such a detainer actually does remain extant with regard to plaintiff, since, at plaintiff's own request, Judge Haight has twice postponed satisfaction of the government's writ of detainer, effectively preventing the BOP from moving plaintiff from MCC–NY to another prison facility. *See Memorandum and Order*, SSS82 Cr. 312 (CSH) (S.D.N.Y. September 12, 1985); *Order*, SSS82 Cr. 312 (CSH) (S.D.N.Y. September 26, 1985).[29]

It should be noted, however, that the in-court testimony which explained the meaning of the phrase "Detainer: Greatest," *see* Hearing Transcript at 52, implicitly relied on a section of the Manual that appears to authorize the addition of points to a prisoner's security total only when there is a detainer relating to "pending charges" or to charges which have resulted in an "adjudicated sentence." *See* Manual, § 9 at 11–12. Thus, under the unusual circumstances of this case (specifically, that the detainer has survived the order of *nolle prosequi* by several weeks), the continued inclusion of a "Detainer: Greatest" listing on plaintiff's Security/Designation sheet may be in contravention of the BOP's internal procedures as set forth in the Bureau's Manual.

■ Nonetheless, such a conclusion does not strengthen plaintiff's due process claim. The BOP's discretion in making classification decisions is virtually unfettered, subject only to the requirement of rationality, *see Smith v. Coughlin, supra*, 748 F.2d at 787. While the Bureau's efforts to establish specific guidelines for classification decisions is laudable, these are essentially procedural regulations that "place no substantive limitations on official discretion and thus create no liberty interest entitled to protection under the Due Process Clause." *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *see Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir.1979) (entitlement akin to a Due Process clause liberty interest cannot derive from a statute that merely establishes procedural requirements for the transfer of state prisoners); *Smallwood-El v. Coughlin*, 589 F.Supp. 692, 699 (S.D.N.Y.1984) (state prison officials' violation of their own procedural rules does not, by itself, establish a constitutional claim).

■ An even more pertinent line of authority holds that the internal procedures manual of an executive agency does not create due process rights in the public. *Lynch v. United States Parole Comm'n*, 768 F.2d at 497; *see, e.g., Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (Social Security Administration claims manual is for internal use only and is without legal force). Thus, plaintiff's argument, that the BOP Manual itself gives federal prisoners due

---

**29.** Although Judge Haight's second order indicated that the government could have the writ of detainer marked satisfied as of October 14, 1985, the government has not, as of the date of this opinion, sought such satisfaction.

process rights that the Constitution does not otherwise provide, is wholly without merit. *See Pugliese v. Nelson,* 617 F.2d at 924 (BOP Policy Statement does not create due process interest).

■ Plaintiff's final attempt to characterize her treatment and classification by the BOP as in violation of her due process rights is based on the BOP's utilization of the charges against Rosenberg contained in the Brinks indictment.[30] According to plaintiff, the presumption of innocence mandates that the BOP be enjoined from including information concerning dismissed charges in its prisoner files, or at least be enjoined from using such information in determining Rosenberg's security classification. *See Complaint at 12.*

Plaintiff's position is simply without support. It is also logically inconsistent with the settled law in this Circuit that sentencing judges may consider unproven allegations of criminal conduct in making their determinations. *See United States v. Roland,* 748 F.2d 1321, 1327 (2d Cir.1984) (sentencing judge may consider crimes of which defendant has been acquitted); *United States v. Sweig,* 454 F.2d 181, 183–84 (2d Cir.1972) (same); *United States v. Cifarelli,* 401 F.2d 512, 514 (2d Cir.), *cert. denied,* 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 448 (1968) (sentencing court may regard crimes for which there has been no conviction as calling for increased punishment); *United States v. Doyle,* 348 F.2d 715, 721 (2d Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965) (judge was entitled to consider dismissed counts in sentencing criminal defendant). Indeed, this Circuit has also held that a parole board may properly consider a prisoner's presentence report, notwithstanding the fact that dismissed charges are included in the report. *Billiteri v. United States Board of Parole,* 541 F.2d 938, 944 (2d Cir.1976). Significantly, the Court in *Billiteri* specifically sanctioned the parole board's use of the presentence report in deciding to place the prisoner's offense in a "high severity" category, *see id.; accord*

*Steerman v. United States Parole Comm'n,* 593 F.Supp. 761, 764 (N.D.Ca. 1984), conduct directly analogous to the BOP's presumed use of the report in classifying Rosenberg.

Based on this line of authority, I find that it is entirely lawful for the Bureau of Prisons to consider dismissed criminal charges in classifying a federal prisoner. The Bureau's legitimate penological objectives, the most obvious of which is to maintain security within prison walls, necessitate the acquisition of "a thorough acquaintance with the character and history" of its prisoners. *See United States v. Doyle,* 348 F.2d at 721. Obviously inaccurate information should be discounted in the ordinary exercise of sound discretion, *see id.,* just as it would seem desirable for prison officials to invite and to consider affidavits by prisoners denying the truth of any unproven allegations. But the information-gathering process does not itself violate constitutional rights.

(b) *Equal Protection*

■ Much of what has been said with regard to due process applies with similar force to Rosenberg's equal protection challenge to her classification by the BOP. I have already noted the Second Circuit's recent response to an equal protection challenge to a classification decision, wherein the Court stated that "prison administrators, when making classifications 'need only demonstrate a rational basis for their distinctions.'" *Smith v. Coughlin,* 748 F.2d 783, 787–88 (2d Cir.1984) (citing *Jones v. North Carolina Prisoners Union, Inc.,* 433 U.S. 119, 134, 97 S.Ct. 2532, 2542, 53 L.Ed.2d 629). The record in this case clearly shows that the BOP possessed a rational, independent basis for its classification of plaintiff. Accordingly, I must conclude that Susan Rosenberg—notwithstanding her dramatic claim, sworn to by plaintiff and asserted by counsel in open court, to the effect that she is a "political prisoner" who has been singled out for disparate

---

30. Plaintiff has characterized such use of unproven allegations as a violation of both her Fifth and Sixth Amendment rights. *See* Complaint at 11, 12.

treatment (*see, e.g.,* Rosenberg Affidavit ¶.5)—has simply failed to state a *bona fide* claim for denial of equal protection. *See Persico v. Gunnell,* 560 F.Supp. 1128, 1137 (S.D.N.Y.1983).[31]

### 2. *First Amendment Claims*

Plaintiff seeks to enjoin defendants from engaging in conduct in retaliation for plaintiff's exercise of her First Amendment rights of free speech and association. In dealing with this claim, this Court must initially take pains to distinguish between those activities which are protected by the First Amendment, and those which are not.

In *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court put to rest the wayward notion that First Amendment guarantees apply in an unlimited fashion to all modes of conduct that communicate ideas, *see id* at 376, 88 S.Ct. at 1678. In *O'Brien,* the Court found that a defendant could be constitutionally convicted of violating a federal statute which prohibited the burning of Selective Service registration certificates (draft cards). *See id* at 377, 88 S.Ct. at 1679. In so ruling, the Court held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech ele-

ment can justify incidental limitations on First Amendment freedoms." *Id.* at 376, 88 S.Ct. at 1678.

■■■ Thus, to the extent that plaintiff's arguments in the case at bar rely on the proposition that she was convicted on the weapons charges in New Jersey in retaliation for her political viewpoints,[32] plaintiff's position is fundamentally unsound. The criminal convicted for his or her conduct should not be heard to complain that the enforcement of criminal laws which serve the public by condemning dangerous behavior are in some way violative of the lawbreaker's First Amendment rights. *See, e.g., United States v. Cooper,* 606 F.2d 96, 98 (5th Cir.1979) *cert. denied,* 444 U.S. 1024, 100 S.Ct. 685, 62 L.Ed.2d 657 (1980) (a controlled substances conspiracy statute does not place impermissible restrictions on First Amendment freedoms of association and expression).

■■■ Furthermore, the record in this case does not show that the BOP ever designated or classified Rosenberg in response to or retaliation for her political beliefs. Rather, the evidence suggests that defendants responded to plaintiff's expressions of her beliefs not because of their political content, but because those expressions placed BOP officials on notice that

---

31. Plaintiff raises the constitutional stakes somewhat by claiming, in a separate cause of action, that defendants treated her in a disparate and discriminatory manner based upon her *gender* in violation of her right to equal protection under the Fifth Amendment. *See* Complaint ¶ 32. There is, indeed, some evidence in this case that Rosenberg's *designation* may have been based, in part, on her gender. *See* Hearing Transcript at 35. But the propriety of plaintiff's several designations is not before this Court, and there is a dearth of evidence in this case that Rosenberg's gender has ever affected her *classification* by the BOP. I might add, however, that the reason why Rosenberg's gender was considered in designation decisions may relate to the small number of federal prisons at which females are presently incarcerated. *See* Hearing Transcript at 82; Findings of Fact ¶ 22. *See also* Plaintiff's Exhibit for November 5, 1985 Evidentiary Hearing # 1 (May 21, 1985 letter of recommendation from Judge Lacey to BOP urging that Rosenberg is too dangerous to be confined at a minimum-security prison, "notwith-

standing the fact that ... the federal prison system is limited in its ability to deal with female inmates.").

In any event, federal courts should not strain to find constitutional violations merely because prison officials are forced to make unusual decisions based on the paucity of penal institutions designed to house females. *See Boudin v. Thomas,* 543 F.Supp. 686, 693 (S.D.N.Y.1982) (placement of prisoner awaiting trial on charges arising out of armed robbery of a Brink's armored truck in a high security detention facility for male inmates "may make it lonely but hardly unconstitutional."). *See also Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) ("the Equal Protection Clause does not require that a State must chose between attacking every aspect of a problem or not attacking the problem at all").

32. *See* Rosenberg Affidavit ¶ 2 ("I am a political prisoner currently incarcerated at MCC–NY ... and ... serv[ing] the 58 years imposed upon me by United States District Judge Lacey.")

the plaintiff might, once incarcerated, threaten prison security by fomenting unrest and possibly even violence within prison walls.

It is a fair inference from the record that Susan Rosenberg's classification, particularly her classification as a "maximum" custody offender (which in turn appears to have led to the BOP's decision to place her in the maximum-security facility at FCI–Lexington), was based in no small part on the BOP's response to Rosenberg's blatantly incendiary outbursts in the New Jersey District Court. *See* Finding of Fact ¶ 4. The question then becomes: to what extent can such an institutional response be tolerated?

The proper analysis for such an inquiry is found in the Second Circuit's recent opinion in *Wali v. Coughlin,* 754 F.2d 1015 (1985). In *Wali,* the Court (per Kaufman, C.J.), affirmed a district court's order enjoining the Commissioner of the New York State Department of Correctional Services and other corrections officials from prohibiting inmates in New York State Prisons from receiving, upon request, copies of a report that was sharply critical of conditions at the Attica Correctional Facility. *See id.* at 1036. The Court, while emphasizing that the rights of prisoners to speak and to receive information were deserving of special solicitude, *id.* at 1034, also noted that prisoners' First Amendment rights "may, of course, be restricted when necessary." *Id.* (citations omitted).

Based upon its reading of a series of decisions by the United States Supreme Court, the *Wali* Court articulated a "tripartite standard" for determining whether a particular response of prison officials to a prisoner's exercise of First Amendment rights will pass constitutional muster:

> Where the right asserted is found not to exist within the prison context, i.e., where it is held to be inherently inconsistent with established penological objectives, *see, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc. supra,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629, then *a fortiori* there can be no invasion of the purported right, and

judicial deference should be nearly absolute. . . .

> Where the activity sought to be engaged in by prisoners is presumptively dangerous, deference to the judgment of corrections officials should be extremely broad, though not categorical. *See e.g., Block v. Rutherford,* —— U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). This, notwithstanding the fact that the restriction being examined does indeed abridge a recognized constitutional right. In such cases, our intuition and common sense would support the imposition of a burden upon prisoners to demonstrate that the restriction is not supported by a reasonable justification.

> \*    \*    \*    \*    \*    \*

> Where, however, the activity in which prisoners seek to engage is not presumptively dangerous, and where official action (or inaction) works to deprive rather than merely limit the means of exercising a protected right, professional judgment must occasionally yield to constitutional mandate. In these limited circumstances, it is incumbent upon prison officials to show that a particular restriction is necessary to further an important governmental interest, and that the limitations on freedoms occasioned by the restriction are no greater than necessary to effectuate the governmental objective involved. *See Procunier v. Martinez, supra,* 416 U.S. [396] at 413, 94 S.Ct. [1800] at 1811 [40 L.Ed.2d 224 (1974) ].

*Id.* at 1033.

In the instant case, plaintiff has basically argued that defendants' decision to treat her as a high-security risk by classifying her as a security-level # 4 prisoner with a "Maximum" custody rating was a restrictive measure that infringed upon plaintiff's First Amendment rights of freedom of association and political expression (and punished plaintiff for her exercise of those rights in the first place). Once again, especially in light of *Wali,* it becomes critical to consider the nature of the First Amendment rights being asserted by plaintiff.

The first of these is the right of association. Indeed, the freedom to associate as

she chooses is clearly prized by plaintiff, see, e.g., Sentence Proceedings at 23 ("Tim [Blunk] and myself ... begin a long struggle alongside other captured comrades as political prisoners. We will continue to struggle and to fight and to resist."). Yet in seizing upon her associational rights, plaintiff ignores the fact that such rights have never been extended to associations inspired by an illegal purpose. *See United States v. Cooper*, 606 F.2d at 98. Thus, she can refer with pride to her participation in "an armed clandestine organization," Sentence Proceedings at 21, and then cry foul, of constitutional magnitude, when the Bureau of Prisons demonstrates its institutional concern.

The Supreme Court has observed that a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). But the Court has also said:

> Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution. Equally as obvious, the inmate's status as a prisoner and the operational realities of a prison dictate restrictions on the associational rights among inmates.

*Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. at 125–26, 97 S.Ct. at 2538. In *Jones*, the Supreme Court held that regulations of the North Carolina Department of Corrections which prohibited various organizing activities of a prisoners' labor union were justified by institutional reasons "sufficiently weighty to prevail" over the First Amendment rights of associ-

ation and free speech asserted by the union. *See id.* at 133, 97 S.Ct. at 2541. The Second Circuit has recently stated that where, as in *Jones*, the rights asserted are "inherently inconsistent with legitimate penological objectives," then "there can be no invasion of the purported right, and judicial deference should be nearly absolute." *Wali v. Coughlin*, 754 F.2d at 1033.

■ It would be the height of folly to regard the dangers posed to prison security by "an armed clandestine organization" as any less substantial than those posed by a prisoners' labor union. In *Jones*, the Court observed that a prisoners' union, with its emphasis on the encouragement of adversary relations with institution officials "would rank high on anyone's list of potential trouble spots." 433 U.S. at 133, 97 S.Ct. at 2541. *A fortiori*, an armed clandestine organization ranks even higher. This Circuit has recently reiterated the proposition that prison security is a correctional institution's foremost goal, *see Wali v. Coughlin*, 754 F.2d at 1032. It necessarily follows that, under the facts of this case, the BOP's decision to classify a self-proclaimed member of an armed clandestine organization as a high-security risk cannot possibly be construed as being in violation of that individual's First Amendment rights.

Moreover, this Court is not seriously troubled by plaintiff's assertion that the BOP's classification decision is an impermissibly punitive response to her expression of political beliefs. *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 8 n. * (objecting to Judge Lacey's reaction to Rosenberg's remarks at sentencing, since "such statements were classic statements of political beliefs."). Relying on decisions within this Circuit in which courts have reacted to apparent overreaching by prison officials in their response to ordinary expressions of political thought,[33] plaintiff would have this

---

**33.** *See Haymes v. Montanye*, 547 F.2d 188, 189 (2d Cir.1976), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977) (prisoner transferred after circulating petition protesting his discharge as prison librarian); *Simmat v. Manson*, 535 F.Supp. 1115, 1116 (D.Conn.1982) (court

preliminarily enjoined transfer of inmate-journalist who published several articles describing his life in prison in a manner sometimes critical of prison administration).

Court extend to her (and thereby, in effect, sanctify) a First Amendment right to preach armed revolution within prison walls without fear of institutional reprisal.

Plaintiff's position is marginally correct, at least in the sense that freedom of speech cannot fairly be characterized as a right "inherently inconsistent with established penological objectives." *Wali v. Coughlin,* 754 F.2d at 1033. In a case, however, where the speech advocates violent response to perceived societal (or institutional) injustice [34] it becomes reasonable for the Bureau of Prisons to regard such expression as "presumptively dangerous," in which instance "deference to the judgment of correction officials should be extremely broad," *Wali v. Coughlin,* 754 F.2d at 1033, and the burden is upon the prisoner to demonstrate that the institutional response is unsupported by "reasonable justification," *id.*

Even if the few factual ambiguities in this case were construed in plaintiff's favor, there still remains in the record uncontroverted facts sufficient to demonstrate reasonable justification for the BOP's decision to classify Rosenberg as a high security risk. Plaintiff was convicted of serious weapons charges involving the possession of dangerous firearms and high-powered explosives. At her sentencing, she expressed regret at her failure to use violence when she was captured.[35] On that same day, in open court, she announced her intention to take the armed struggle inside prison walls.

Defendants have done no worse injustice to Susan Rosenberg than to take her at her word and to treat her as a dangerous prisoner. The suggestions by plaintiff's counsel that Rosenberg's good behavior in prison negates any justification for the BOP's classification, *see* Hearing Transcript at 89–90, are unconvincing. Even if Rosenberg's conduct during the first year of her 58–year sentence had been exemplary, the BOP should not then be required to lower its otherwise reasonable guard. *Cf. United States v. Albertini* —— U.S. ——, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985) (where the government's important interest in assuring the security of military installations is served by allowing a military commander to issue an order barring an individual from a military base, nothing in the First Amendment conditions that order on the post-arrival conduct of the excluded individual).

Accordingly, it is my determination that the BOP's treatment and classification of Susan Rosenberg has not been in violation

Plaintiff also cites *Hilliard v. Scully,* 537 F.Supp. 1084 (S.D.N.Y.1982), in which defendants' summary judgment motion was denied because a genuine issue of material fact existed with regard to plaintiff's claim that his prison transfer was designed to frustrate his constitutional right to seek judicial relief. *See id.* at 1090. *Hilliard* is completely distinguishable from the case at bar, since it involved an official response to a prisoner's exercise of his right of access to the courts, a right which the Supreme Court has stressed must not be diminished inside prison walls. *See, e.g., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

**34.** At her sentencing, Rosenberg stated that, in prison, she and Blunk "will struggle alongside our many comrades in the armed clandestine movement and in the mass struggles to forge a revolutionary anti-imperialist resistance movement." Sentencing Proceeding at 23.

**35.** At her sentencing, Rosenberg made the following comments on behalf of herself and Timothy Blunk:

We believe that our failure to internalize some of the [revolutionary] lessons that I'm talking about now are what resulted in our capture.

My comrade Tim and I, and we say this with no shame, but to learn from our own mistakes, were busted, captured, because we vacillated on our own revolutionary principles and policics. Because Tim and I thought that we were good enough revolutionaries. Because we used the fact that we had made a deep commitment and had sacrificed much to justify weakness on our part. We relied on our white and our class privilege. We fell back on who we were, and not what we are and want to be. We were challenged when we were captured as we had never been before. And we failed, our own individualism led us to that failure. Our own internalization of our principles wasn't deep enough to fight to win. To be willing, in assessing the risks, to sacrifice our individual well-being for the advancement of our collective strategy. Important lesson.

Sentence Proceedings at 22.

of any of her constitutional rights.[36] Plaintiff has shown no irreparable injury, and no likelihood of success on the merits. I find that no questions going to the merits have been raised that present a fair ground for litigation, and the balance of hardships tip in defendants', rather than in plaintiff's, favor. Plaintiff's motion for a preliminary injunction is therefore denied. Furthermore, the temporary restraining order which has prevented the BOP from transferring Rosenberg from MCC–NY, and which I now regard as having been improvidently granted, is hereby dissolved.

## V. PLAINTIFF'S DEMAND FOR PERMANENT INJUNCTIVE RELIEF

■ At the September 26 hearing of this case, as I have already noted, *see* Part I of this opinion, *supra,* I ordered the trial of the action on the merits consolidated with the hearing on plaintiff's application for a preliminary injunction, pursuant to Fed.R.Civ.P. 65(a)(2), and the parties agreed to such consolidation.[37] In deciding whether or not to grant plaintiff permanent injunctive relief, the court initially inquires as to whether plaintiff has prevailed on the merits. *See Smithkline Beckman Corp. v. Proctor & Gamble Co.,* 591 F.Supp. 1229, 1235 (N.D.N.Y.1984), *aff'd mem.* 755 F.2d 914 (2d Cir.1985). In the context of a suit in which plaintiff seeks permanent injunctive relief from a constitutional violation, the court should first consider whether plaintiff has established the fact of a violation. *See Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561

(1976); *Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983). If plaintiff succeeds in proving a constitutional violation, he must still demonstrate the presence of a continuing irreparable injury and the lack of an adequate remedy at law. *Id.* (citing *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)). Only when that dual burden has been satisfied should the court grant injunctive relief, but even then the relief granted should be no broader than necessary to cure defendants' unconstitutional conduct. *See Kendrick v. Bland,* 740 F.2d 432, 437 (6th Cir.1984).

■ Applying the foregoing analysis, I conclude that there is no basis for granting plaintiff's motion for permanent injunctive relief, primarily because I am convinced that no facts have been proven, and no facts could be proven, that would establish the violation of plaintiff's constitutional rights by defendants.

As regards prospective proof,[38] I would note that plaintiff has requested further testimony from only three individuals: Susan Rosenberg; Norman Carlson (Director of the Bureau of Prisons); and Scott Miller (the BOP official who decided what remarks and information should be included in plaintiff's Security/Designation form, *see* Hearing Transcript at 62–63). Rosenberg's 13-page affidavit has already been submitted to this Court, and Carlson and Miller's involvement in the plaintiff's classi-

---

**36.** So that there will be no doubt on this question, I am specifically holding, to the extent I have not already done so, that there is no basis for finding Rosenberg's classification to have been in violation of her Eighth Amendment rights. It is clear that even mistaken classification does not itself inflict pain within the meaning of that Amendment. *See Hoptowit v. Ray,* 682 F.2d 1237, 1256 (9th Cir.1982); *cf. Persico v. Gunnell,* 560 F.Supp. 1128, 1137 (S.D.N.Y.1983) (repeated prison transfers do not give rise to Eighth Amendment claim).

**37.** Thus, I am satisfied that the parties were given notice of consolidation "sufficient to give them an adequate opportunity to present their case." *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 101 (2d Cir.1985).

**38.** My analysis of what facts could have been proven by plaintiff is prompted by this Court's awareness that, notwithstanding "the broad discretion accorded the district court by Rule 65(a)(2)," an order of consolidation may still be overturned on appeal upon "a showing of substantial prejudice in the sense that a party was not allowed to present material evidence." *Abraham Zion Corp. Lebow,* 761 F.2d 93, 101 (2d Cir.1985). Thus, a district court should only deny a consolidated motion for permanent injunctive relief if the court is convinced that no material evidence (*i.e.,* evidence which could cast doubt upon the court's rationale for denying the motion) remains to be presented.

fication have already been testified to in some detail by Randy Brachman, the Case Management Coordinator for MCC–NY, during his full day of testimony before this Court. Testimony from any of these individuals regarding the designation of Susan Rosenberg would of course not be material to these proceedings, since all claims regarding plaintiff's designation have been dismissed as moot. As to possible testimony regarding Rosenberg's classification, there has been no suggestion made that, were she called to testify, Susan Rosenberg would go beyond the assertions made in her affidavit, to the effect that she has been improperly classified on the basis of unproven allegations of criminal conduct and in retaliation for her political beliefs and associations, *see* Rosenberg Affidavit ¶¶ 4, 5. These assertions have already been considered by this Court in reaching its conclusion that the BOP's classification of Rosenberg did not violate any of plaintiff's constitutional rights. Indeed, there is no likelihood that testimony by Carlson or Miller would present facts to this Court that would be material, in the sense that they could alter the Court's conclusion that no constitutional violation has occurred. This Court has already determined that the BOP possessed a rational basis for its classification of Rosenberg, *see* Part IV of this opinion, *supra*. Even if Carlson or Miller were to testify that Rosenberg's classification *was* in partial response to her political beliefs or associations (an unlikely admission in view of the record already estab-

lished in these proceedings), this Court would still be left with a situation in which plaintiff's classification is based on both proper and improper reasons, but in which the "administrative, non-punitive" reason provides an independent basis for her classification. Under such circumstances, no violation of constitutional rights can be said to have occurred. *See Sher v. Coughlin*, 739 F.2d at 81–82.

Thus, this is a case where plaintiff has not satisfied, and cannot possibly satisfy, her threshold burden of proving of a constitutional violation, *see Newman v. State of Alabama*, 683 F.2d at 1319. Accordingly, her motion for permanent injunctive relief must be denied.

## VI. PLAINTIFF'S DEMAND FOR A DECLARATORY JUDGMENT

■ Plaintiff in this case has also made a broad demand for declaratory relief.[39] At this point, however, I am convinced (for the reasons set forth in Part IV.B of this opinion, *supra* ) that there is absolutely no basis for plaintiff's claim that defendants have violated her constitutional rights. Indeed, it is this Court's view that plaintiff's action for declaratory judgment could not withstand a motion for summary judgment, or a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Nonetheless, since defendants have not moved for dismissal on either of those grounds, I have reluctantly concluded that it is not presently within this Court's power to dismiss plaintiff's claim for declaratory relief.[40]

---

**39.** Plaintiff seeks "[a] declaratory judgment that the acts of defendants ... violate plaintiff's rights to due process of law, to equal protection of the law, to be free from cruel and unusual punishment, the presumption of innocence and to freedom of association and beliefs." Complaint at 12.

**40.** In this regard, I have considered this Circuit's express approval of "a *sua sponte* award by the court of summary judgment to a non-moving party where it appear[s] from the papers, affidavits and other proofs submitted by the parties that there [are] no disputed issues of material fact and that judgment for the non-moving party would be appropriate as a matter of law." *Lowenschuss v. Kane*, 520 F.2d 255, 261 (2d Cir. 1975) (citation omitted); *accord Project Release v. Provost*, 722 F.2d 960, 968 (2d Cir.1983). In-

deed, such an award strikes this Court as especially appropriate in the instant case, notwithstanding the need to construe whatever disputed facts remain in this litigation in the light most favorable to plaintiff, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Project Release v. Provost*, 722 F.2d at 968.

*Sua sponte* summary dismissal does not appear possible in this case, however, because plaintiff has been given no notice that the Court was contemplating such a measure. *See Herzog & Straus v. GRT Corp.*, 553 F.2d 789, 792 (2d Cir.1977) (ten day notice requirement of Fed.R. Civ.P. 56(c) should be applied by analogy to cases in which a district court grants summary judgment on its own motion); *but see id.* at 793 (Timbers, C.J., specially concurring) (unnecessary to incorporate the notice provision of Rule

Similarly, it would be improper for this Court to address plaintiff's claim for compensatory or punitive damages at this juncture, since plaintiff arguably seeks such relief as ancillary to her action for declaratory judgment.[41]  I would note, however, that even if Rosenberg were to establish a compensable injury, the facts of this case suggest that defendants may still be entitled to qualified immunity. *See Gilliam v. Quinlan,* 608 F.Supp. 823, 836 (S.D.N.Y. 1985) (prisoner's § 1983 action against prison officials and employees dismissed on defendants' motion for summary judgment on grounds of qualified immunity).  The Second Circuit has recently declared that such immunity is "available to prison officials as a defense to liability for damages for actions taken in their official capacities." *Security and Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187, 210 (2d Cir.1984).  Defendants, who have yet to answer in this case, will of course be obligated to plead qualified immunity as an affirmative defense, *see Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).

### CONCLUSION

Plaintiff's complaint is partly dismissed as moot, to the extent described in Part III of this opinion, *supra.*  Plaintiff's motion for a preliminary injunction is denied.  Plaintiff's motion for a permanent injunction is also denied.  With regard to plaintiff's surviving action for declaratory judgment, defendants are invited to consider the possibility of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), or, in the alternative, a motion for summary judgment pursuant to Fed.R.Civ.P. 56.

SO ORDERED.

56(c) into every *sua sponte* summary judgment order, since the rare case may arise when an accelerated determination can be made without unfairness to the parties).

41. In an apparent oversight, plaintiff's complaint fails to assert jurisdiction under 28 U.S.C. § 2201 (jurisdiction of federal courts to render declaratory judgments).  The complaint does, however, assert jurisdiction based on 28 U.S.C.

§ 2202, which authorizes federal courts to grant "[f]urther necessary or proper relief based on a declaratory judgment or decree." Construing plaintiff's complaint as generously as possible, her claim for damages may be viewed as pursuant to § 2202, and therefore dependent on this Court's decision on plaintiff's demand for declaratory relief.